UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Adam Snyder (SBN 312160)
767 S. Alameda St., Suite 270
Los Angeles, California 90021
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
matthew@umklaw.com
adam@umklaw.com

*Attorneys for Plaintiff David Michaels*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

DAVID MICHAELS, an individual,

Plaintiff,

v.

SEAN CROCKETT, an individual; ISHANI WINSTON, an individual; and DOES 1 through 20, inclusive,

Defendants.

Case No. 26-cv-12108

**COMPLAINT FOR:**

1. **VIOLATION OF SECURITIES EXCHANGE ACT § 10(b) AND RULE 10b-5(b) (UNTRUE STATEMENTS AND OMISSIONS)**
2. **VIOLATION OF SECURITIES EXCHANGE ACT § 10(b) AND RULE 10b-5(a), (c) (SCHEME TO DEFRAUD)**
3. **CONTROL PERSON LIABILITY (SECURITIES EXCHANGE ACT § 20(a))**
4. **VIOLATION OF CORPORATIONS CODE §§ 25401, 25501, 25504, 25504.1**
5. **FRAUD—INTENTIONAL MISREPRESENTATION**
6. **FRAUD—FALSE PROMISE (FRAUDULENT INDUCEMENT OF FORBEARANCE)**
7. **FRAUD—CONCEALMENT**
8. **NEGLIGENT MISREPRESENTATION**
9. **BREACH OF ORAL CONTRACT (LOAN)**
10. **BREACH OF CONTRACT**
11. **BREACH OF FIDUCIARY DUTY**
12. **ACCOUNTING**
13. **CONVERSION**
14. **COMMON COUNTS**
15. **VIOLATION OF PENAL CODE § 496**

**DEMAND FOR JURY TRIAL**

## PRELIMINARY STATEMENT

1. Plaintiff David Michaels ("Michaels" or "Plaintiff") brings this action under the Securities Exchange Act of 1934 and California law against Sean Crockett ("Crockett") and Ishani Winston ("Winston") (together, "Defendants"), a married couple who were his two closest friends for nearly twenty years. Over nine years Defendants used that friendship to obtain $375,000 in loans and 6 Bitcoin and 75 Ether (the native cryptocurrency of the Ethereum network) in investment capital, paid him less than $40,000 in distributions, and, when Michaels finally told them that he would take action to recover what was his, bought his continued forbearance with promises of specific payments on specific dates that they had no intention of keeping.

2. Defendants obtained Michaels's money, and then his patience, through four transactions. *First*, from 2017 to 2019 they borrowed $375,000 for a healthcare-software startup, telling Michaels that the company was about to sign tens of millions of dollars in contracts and that Winston held a $15 million trust that stood behind repayment but could not yet be touched. *Second*, in September 2022 they sold Michaels an interest in a cryptocurrency trading venture that Crockett alone would manage, in exchange for his 6 Bitcoin and 75 Ether, by portraying Crockett as a trader of extraordinary skill who had multiplied other people's money many times over. *Third*, in 2024 and 2025 they told Michaels that the venture, which they called "Crest Capital," was about to become a hedge fund funded with millions of dollars by a wealthy investor they called "Dr. B" and operated through a registered investment adviser, and on the strength of those representations they induced him to accept a one-third interest in that fund while his capital remained in their hands. *Fourth*, from June through December 2025 they told Michaels that his share of the fund's profits was $2 million, that he would receive an $850,000 "bonus," and that his capital, his profits and his bonus would be paid to him on a series of dates certain.

3. The interest Defendants sold Michaels was a security. He invested his assets in a common enterprise, and his return depended entirely on the trading of Crockett, who

alone controlled every account in which the assets were held. Defendants sold him that security by means of statements about Crockett's trading record, the venture's structure and regulatory status, its anchor investor, and the location and safety of its assets that were false when made, and by omitting the facts that would have revealed them to be false: that the assets were held in dozens of accounts, opened without identity verification, on an offshore exchange that does not permit United States customers, which Defendants accessed through a foreign virtual private network ("VPN") in order to evade that prohibition; that no entity, no registration and no bank account existed; and that Defendants, who in 2021 had described themselves as "trading crypto to make rent," had neither the assets nor the results they described.

4. The promises with which Defendants held Michaels off were not forecasts of how an investment might perform. They were unconditional statements that a particular sum would be paid on a particular day, and each was made after Michaels had told Defendants that he was out of time and would pursue his rights. On September 19, 2025, after Michaels disclosed that he had taken out a margin loan and owed six years of back taxes, Crockett wrote: "Your money with the extra bonus will hit my account on 10/3." Then the date became October 4, then October 24, then a meeting with Dr. B on November 9, then November 23. On December 14, 2025, when Michaels demanded that Defendants commit to December 25 and warned that otherwise "we are decidedly in litigation," Winston answered, "we agreed on the 25th," "absolutely," and "i give you a date and my word." Each time, Michaels stood down. Each date passed without payment.

5. Within days after Winston gave her word, in recorded telephone calls to which both Defendants consented, Winston and Crockett disclosed for the first time that Michaels's assets were held in 33 accounts on an offshore exchange that does not permit United States customers, accessed through a VPN in Palau, some of them frozen, and that a related account bore Dr. B's name. On December 24, 2025, Crockett wrote that he "won't be able to send you your money on the 25th." Defendants then stopped responding to Michaels altogether and ignored a formal demand.

6. Throughout, Defendants treated the venture's benefits as their own and its obligations as Michaels's problem. By their own account they received from the venture's investor a $7 million check made payable to Crockett personally, a luxury automobile, handbags, the use of his credit card and other gifts. Michaels—their partner, and by their agreement a one-third owner—received no distribution after November 2023, no account statement at any time, no meeting with the investor whose money he was told his venture was managing, and no document evidencing his interest.

7. Dr. B was not the first wealthy benefactor Defendants held out to Michaels. In 2019, Defendants told Michaels that a rich relative of Winston's, "Uncle Tim," owned a share of a famous yacht and had invited Michaels and others on a two-week Mediterranean cruise, with a private jet to carry them to it. Michaels cut short a family trip to make the flight; other guests flew to Rome; and no yacht, jet or uncle ever appeared. The uncle of 2019 and the investor of 2024 and 2025 served the same purpose: a source of wealth whom Michaels could never meet, whose generosity was always imminent, and whose affairs explained every delay. When Michaels's patience was nearly spent, Defendants reached for the most personal thing they knew about him: they told him that Dr. B, like Michaels, had suffered abuse as a child, that Dr. B regarded him as a kindred spirit, and that Dr. B wanted to hold his hand when his money was returned. Michaels waited again.

8. Michaels seeks rescission of his purchases of the securities or damages for it under the federal and California securities laws; repayment of the $375,000 loan with interest; the return of his 6 Bitcoin and 75 Ether or their value; the sums Defendants promised him in exchange for his forbearance; an accounting; the imposition of a constructive trust; and compensatory, treble and punitive damages.

**PARTIES**

9. Plaintiff David Michaels is an individual residing in Los Angeles County, California.

10. Defendant Sean Crockett is an individual residing in Los Angeles County,

California.

11. Defendant Ishani Winston is an individual residing in Los Angeles County, California. Winston is Crockett's spouse and resides with him.

12. The true names and capacities of the defendants sued as Does 1 through 20, inclusive, are unknown to Michaels, who therefore sues them by fictitious names. Michaels is informed and believes that each Doe defendant participated in, assisted, or received the proceeds of the conduct alleged in this Complaint, including the person Defendants referred to as "Dr. B" and any person or entity holding Michaels's funds or digital assets. Michaels will seek leave to amend this Complaint under Rule 15 of the Federal Rules of Civil Procedure to allege their true names and capacities when they are ascertained.

13. At all relevant times each Defendant acted as the agent, co-venturer and co-conspirator of each other Defendant, with the knowledge, authorization and ratification of each other Defendant. Statements made to Michaels by Winston concerning the venture were made with Crockett's knowledge and authority, and Crockett directed Michaels to raise financial matters with Winston.

## JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction over the First, Second and Third Causes of Action under 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa(a), because those claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

15. This Court has supplemental jurisdiction over the remaining causes of action under 28 U.S.C. § 1367(a). Those claims arise from the same transactions, representations and promises as the federal claims—the same loan, the same investment, the same venture, the same statements and the same failure to pay—and form part of the same case or controversy.

16. This Court has personal jurisdiction over Defendants. Each Defendant is

domiciled in and resides in California, and each committed the acts alleged in this Complaint in California. Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), also provides for nationwide service of process.

17. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), because acts and transactions constituting the violations alleged occurred in this District and because Defendants are inhabitants of and are found in this District, and under 28 U.S.C. § 1391(b)(1) and (b)(2), because all Defendants reside in this District and a substantial part of the events giving rise to the claims occurred here.

18. Assignment to the Western Division is appropriate because Defendants reside in Los Angeles County and a substantial part of the events giving rise to the claims occurred there.

19. In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including telephone calls; text messages sent over the internet through the messaging application Telegram; video calls; wire transfers through Bank of America; transfers of Bitcoin, Ether and USDC, a cryptocurrency pegged to the United States dollar, recorded on public blockchains; and accounts at cryptocurrency exchanges, including Coinbase and Bybit, an exchange organized outside the United States that Defendants accessed through a virtual private network routed through Palau.

## FACTUAL ALLEGATIONS

### A. The Parties' Relationship

20. Michaels and Crockett have been close friends for approximately twenty years.

21. Michaels met Winston through Crockett and became one of her closest friends. Winston has described Michaels as her "best friend since I moved to LA."

22. Defendants repeatedly told Michaels that he was "family." In January 2019 Crockett called Michaels "our guardian angel," and in October 2024 Crockett wrote to Michaels, "You and Ishani are my only real family."

23. Michaels trusted Defendants completely and they knew it. In December 2024 Crockett wrote to Michaels: "You have been the most loyal and trustful person in my life," and "all you've done is trust me in every way possible for years on end."

**B. The Astralo "Bridge Loan" (2017–2019)**

24. Crockett and Winston founded a healthcare-software company called Astralo, later renamed Ravara.

25. In or about January 2017, Crockett and Winston asked Michaels for a short-term "bridge loan" (the "Loan") to fund Astralo until revenue that they said was imminent arrived.

26. To induce the Loan, Crockett and Winston told Michaels that Astralo was about to sign contracts with large medical practices and hospital systems that would produce tens of millions of dollars in recurring revenue, and that the Loan was therefore at no risk of non-repayment.

27. To further induce the Loan, Crockett displayed to Michaels, on a mobile banking application on Crockett's phone, an account that purported to hold approximately $15 million. Crockett and Winston told Michaels that the account was a trust fund belonging to Winston.

28. Crockett and Winston told Michaels that the trust could not be used to fund Astralo or to repay him directly, but that it stood behind the Loan.

29. In reliance on these representations, Michaels agreed to lend Crockett and Winston $375,000, to be advanced in installments as Astralo required.

30. The agreement for the Loan was oral. Crockett and Winston agreed to repay the funds in full. No date for repayment was fixed: the Loan was to bridge Astralo until it received the financing or revenue that Defendants represented was imminent, and was in any event repayable within a reasonable time. No interest was charged at the outset, because the Loan was to be short-term and was made to Michaels's closest friends.

31. On or about January 13, 2017, Michaels wired $100,000 to Crockett's account at Bank of America.

32. On or about August 31, 2017, Michaels wired an additional $25,000 to Crockett's Bank of America account.

33. On or about January 8, 2018, Michaels wired an additional $100,000 to Crockett's Bank of America account.

34. On January 11, 2019, Michaels asked Crockett by text message to "send me the account info." Crockett responded with the name, account number, routing number and address for his Bank of America account, and wrote, "I just emailed it to you as well so it's easily searchable."

35. In January 2019, Michaels transferred an additional $100,000 to Crockett's Bank of America account.

36. Upon receiving those funds on January 15, 2019, Crockett wrote to Michaels: "You are literally a life (and Astralo) saver," and "Thank you for saving us, and generally being here to support us, during these dark and crazy times."

37. In January 2019, Michaels transferred a further $50,000 to Crockett's Bank of America account.

38. In total, Michaels lent Defendants $375,000 under the Loan.

39. On March 6, 2021, Crockett acknowledged in writing that "All the money you gave for that loan went into the company."

40. Defendants continued to represent that Astralo's contracts and revenue were imminent. On May 26, 2019, Crockett sent Michaels what he described as an email from an Astralo customer approving a price of "$100K per hospital" and offering a cashier's check, and wrote that Astralo had "85M in contract value over 5 yrs." On June 2, 2019, Winston wrote, "Yessss! We're picking up the check." On January 20, 2021, Crockett wrote, "We honestly had signed contracts for over 10M of ARR [annual recurring revenue]."

41. Defendants also continued to represent that the trust existed. On February 1, 2021, Crockett wrote that he and Winston "literally have a trust with 10s of Ms in it that we can't energetically access right now," and that they were "trading crypto to make

rent." On March 6, 2021, Crockett wrote, referring to the trust and to Nitin, a man Defendants described to Michaels as their spiritual advisor: "As for the trust and Nitin, that is all real too. We have a trust with a lot of money in it. We also have never touched a dime of it because Ishani's family believes that energy has to be cleared before we can use it."

42. Defendants subsequently agreed that the Loan would be repaid with interest, and on April 9, 2025, Crockett confirmed in writing that Defendants would repay "all debts / investments plus interest."

43. Defendants have never repaid any part of the principal of the Loan and have never paid any interest on it.

44. Astralo never obtained the contracts or revenue that Defendants had represented. In January 2021 Crockett attributed the failure to the pandemic. By February 2021 Crockett reported that he and Winston were "extricating" from the company, and by December 2021 Crockett described it as a business they were "not actively working on."

45. No trust fund of the kind Defendants represented existed. Defendants never produced any document evidencing the trust and never drew on it. When Michaels confronted Crockett on the recorded December 18, 2025 call with the fact that Crockett had shown him "an account with $15 million in it" years earlier to induce the Loan, and that Michaels had later been told "there was no trust fund," Crockett denied neither statement. He responded, "The truth is that you will have your money on the 25th with account statements leading up to then."

**C. The "Uncle Tim" Yacht Trip (2019)**

46. In the spring of 2019, months after Michaels advanced the final installments of the Loan and while Defendants were telling him that Astralo's contracts and customer check were imminent, Defendants told Michaels that a wealthy relative of Winston's, whom they called "Uncle Tim," owned a one-third interest in the Nautilus, an internationally known mega-yacht, and had invited Michaels and several of Crockett's

friends to join Defendants aboard it for a two-week cruise of the Mediterranean.

47. Defendants asked Michaels to keep Uncle Tim's role in the trip secret. On May 18, 2019, Crockett wrote to Michaels, "Don't mention anything about uncle Tim bc it's on her biological dad's side," and Winston wrote that her family knew about the yacht trip, "Just not that uncle Tim hooked it up."

48. The trip's logistics were handled by a person Defendants identified as Uncle Tim's personal assistant, "Jeannie," who communicated with the guests only by text message through the WhatsApp application. Michaels never met or spoke with Jeannie. Michaels is informed and believes that "Jeannie" was not a real person and that the telephone number from which her messages were sent was controlled by Winston.

49. On June 6, 2019, Crockett referred in writing to "the $1M/week yacht were paying for," and Winston, reporting that she was on the telephone with Uncle Tim, told Michaels that a private jet would leave Santa Monica Airport at 10:00 a.m. the next morning to carry Michaels, Crockett, Winston and Uncle Tim to the yacht, a flight she said was "only gonna take 10 hours." At Defendants' urging, Michaels cut short a trip with his family and flew across the country to be in Los Angeles for the flight.

50. Several of the other invited guests had already flown to Rome, where the cruise was to begin. On the morning of June 7, 2019, Crockett wrote to Michaels: "don't leave for the airport . . . We have to push the trip bc uncle Tim has a work emergency." Crockett offered the guests "$1K cancellation money" and wrote that "Uncle Tim just texted" to say that "the three of us will get matching track bikes to make up for this delay." The guests who had traveled to Rome went to the marina from which the cruise was to depart and were told by marina staff that no vessel called the Nautilus had been docked there. Defendants attributed each later postponement to Uncle Tim's business affairs and described the guests who complained as disloyal. The trip never took place.

51. Michaels is informed and believes that no relative of Winston or Crockett owned an interest in a yacht called the Nautilus or had chartered one, that no private jet had been arranged, and that the trip was a fiction. The facts on which that belief is based

are these: no yacht, jet or "Uncle Tim" ever appeared; the vessel was not at the marina where Defendants said it would be; the invitation was managed through an "assistant" whom no one met; Defendants asked Michaels to conceal Uncle Tim's involvement from Winston's own family; and after Defendants cut off contact with Michaels in December 2025, one of the guests who had traveled to Rome told Michaels that he did not believe the yacht had ever existed. Defendants nonetheless continued to hold Uncle Tim out to Michaels as a source of family wealth, telling him in July 2019 that Uncle Tim had rented a car for Winston as a birthday gift and, in December 2020, that Crockett was advising Uncle Tim on his investments.

52. The yacht episode reinforced the representations on which the Loan rested—that Winston came from great wealth, held a multimillion-dollar trust, and had family who could and would provide for Defendants—and did so in the months after the last installment of the Loan was advanced and before Michaels first asked when it would be repaid. It also established the device Defendants would use again with "Dr. B": a wealthy benefactor whom Michaels never met, whose generosity was always imminent, whose affairs explained every postponement, and whose existence and wealth Michaels had no means to verify.

### D. Defendants Repeatedly Acknowledge the Loan and Promise Repayment (2019–2025)

53. Between November 2019 and April 2025, Michaels asked Defendants in writing on numerous occasions when the Loan would be repaid. On each occasion Defendants acknowledged the Loan and promised to repay it on a stated timetable. Defendants did not keep any of those promises.

54. On November 21, 2019, Michaels asked Crockett by text message for "a sense of timing on repaying the loan," explaining that he had received a large tax bill and had no income. Crockett replied: "Of course, man. You have every right to bring this up and we're so grateful to you. Can I get back to you with more info and a timeline next week?" Crockett never provided a timeline.

55. On December 2, 2020, Michaels asked Crockett by text message, "can you give me a date certain for repaying the loan?" Crockett replied: "It'll happen as soon as our funding closes, which was supposed to happen in November, but is taking a little longer because of the COVID circumstances," and "We're close and it could be any day in the next week or two."

56. On December 29, 2020, in response to Michaels's question whether Defendants would close their financing "in the next couple of weeks," Crockett wrote, in three successive messages: "Very, very, very likely before the end of January"; "Very likely before 1/15"; "Likely before 1/7."

57. On January 20, 2021, Crockett wrote that the financing was delayed and that "If I can get my Bybit bag big enough in the coming weeks, I'll hit a tipping point where we'll be able to pay you back that way."

58. On February 19, 2021, Crockett wrote: "In terms of the loan, our goal is to work as hard as we can at this, get our bags as big as possible, and pay you back by the end of spring or early summer. As I mentioned when you came over that night, our intention is to pay you back the loan from our half of the profits."

59. On March 6, 2021, Crockett wrote: "As far as the loan, we have two options: I will go back to the company and raise money from the VCs and we can get that closed in a month or two. If don't do that and I trade exclusively, we can get you the money by the summer. I'm happy to sign a demand note or other loan document to help make the accounting easier for you." No note or loan document was ever signed.

60. On March 8, 2021, Winston wrote to Michaels: "Then we'll figure out a repayment plan for the loan." No repayment plan was ever provided.

61. On October 17, 2021, in response to Michaels's request for "an update on the loan," Crockett wrote: "Ishani and I have $100K in assets, and we're trading all of it to make the money to repay your loan. That $100K started off as $10K, so we're through the hardest part"; and "I think I can double our bag every month, which would put us on track to pay you back by the middle/end of December."

62. On November 17, 2021, Crockett wrote that he was "still feeling good about hitting our targets and paying you back by EOY. If there are any delays because of my mom and my ability to trade, it'll be a matter of weeks, not months."

63. On March 26, 2022, Crockett wrote: "in terms of my trading bag and the loan, not much has changed since last time we spoke. I've made some gains, but not enough to move the needle in terms of timing updates given that BTC has been in such a tight range the last few weeks."

64. On August 25, 2024, Michaels wrote to Winston, "I prefer to not have loaned you and Sean so much money for so many years at no cost to you." He added, "It seems like using my money to fund your lives is totally acceptable to you." Winston did not dispute the Loan. She asked Michaels to wait until after an examination Crockett was to take on August 30, 2024, writing that "the second after the exam we are there and things will be completely different and we can get everything up and running," and "i'm going to get us all there if it's the last thing i ever do."

65. On April 9, 2025, Crockett wrote: "We will scale out of our positions and will pay you back all debts / investments plus interest as soon as possible. Give me a few days to provide a realistic timeline on that." Crockett never provided a timeline.

**E. The Trading Partnership and Michaels's Purchase of an Interest in the Venture for 6 Bitcoin and 75 Ether (2020–2022)**

66. Beginning in late 2020, Defendants told Michaels that Crockett had become an exceptionally skilled trader of cryptocurrency. On December 27, 2020, Winston wrote to Michaels that a wealthy relative—the same "Uncle Tim" of the yacht trip—had entrusted his portfolio to Crockett and that "Since Sean started managing his crypto portfolio he's up over 500%!" The same day Crockett asked Michaels, "What are your total BTC and ETH holdings and average buy-in prices again?"

67. On January 13, 2021, Crockett wrote to Michaels that he had "turned 1 eth to 7," and that "I'm a fucking ninja and I only place bets when I get confirmation that a trend has started and we get in and get the fuck out and take huge profits."

68. In January 2021, Crockett and Michaels discussed Crockett trading cryptocurrency belonging to Michaels on the Bybit exchange, with the trading profits to be used in part to repay the Loan.

69. In late January 2021, as a trial, Michaels transferred to Crockett 0.95 Bitcoin and 10 Ether. Crockett later confirmed in writing: "You gave us 33 ETH (the 0.95 BTC converted into 23 ETH), and we put in 10."

70. On February 19, 2021, Michaels asked Crockett for "an exact amount" of the assets being traded and wrote, "I need more visibility into my finances." Crockett replied that it was "impossible to know exactly how many we have at any given moment," proposed updates three times a week, and stated that Michaels and Defendants would share trading profits equally.

71. When Michaels asked for the return of the trial assets in February 2021, it took Defendants approximately six weeks to return them. During that period Crockett told Michaels that Crockett's Coinbase account had been "frozen due to suspicious activity" because Crockett had "been using a VPN from other countries to log in."

72. Defendants returned the trial assets on March 15 and 16, 2021.

73. In or about September 2022, Michaels, Crockett and Winston agreed that Michaels would contribute 6 Bitcoin and 75 Ether as capital to a cryptocurrency trading venture that Crockett would manage; that the venture's trading profits would be applied first to return Michaels's 6 Bitcoin and 75 Ether to him, second to repay the Loan with interest, and thereafter would be shared between Michaels and Defendants; and that Defendants would keep Michaels informed of the venture's positions and results (the "Trading Partnership Agreement").

74. On September 22, 2022, Crockett sent Michaels by text message a Bitcoin deposit address (1GY5oiGHscygmKU9X4Ej7kAiiWBBJTs8oy) and an Ethereum deposit address (0xa369fa17b7f0099018e48d5f39d50b01db57f55e) to which Michaels's assets were to be sent.

75. On September 26, 2022, Michaels transferred 6 Bitcoin to the Bitcoin

address Crockett had provided and wrote, "Sent 6 btc . . . Please confirm that you received the btc."

76. On September 27, 2022, Michaels transferred 75 Ether to the Ethereum address Crockett had provided and wrote, "75 eth sent." Winston confirmed receipt: "just got it!"

77. At the time of transfer, the 6 Bitcoin and 75 Ether had a combined market value of approximately $215,000.

78. Upon receiving the assets, Winston wrote to Michaels: "I'm so excited for this beautiful new beginning. In a few years, we're going to be telling stories about how this all began."

79. Defendants named the venture "Crest Capital Group," and later "Crest Capital Management" or "Crest" (the "Venture"). Michaels is informed and believes that the Venture was never organized as a corporation, limited liability company, limited partnership or other registered entity.

80. Michaels, Crockett and Winston referred to one another as "partners" and "business partners" in the Venture and to the three of them as "the triumvirate."

81. Michaels's interest in the Venture was that of a passive investor. Under the Trading Partnership Agreement, Crockett alone decided which assets to trade, on which exchange, in what amounts and when. Michaels had no role in trading; no signatory authority over, and no access to, any account, wallet or exchange in which the Venture's assets were held; no right to direct, approve or veto any trade; and no means of withdrawing his assets except through Defendants.

82. Michaels's assets were pooled with Defendants' own assets and traded together as a single "bag," in Crockett's word, so that Michaels's profits and losses rose and fell with Defendants' and with the results of Crockett's trading.

83. Michaels's return depended entirely on Crockett's trading. Defendants represented that trading to be extraordinarily profitable, and Michaels had no ability to replace Crockett, to trade the assets himself, or to verify Crockett's results.

84. Defendants gave Michaels no written agreement, subscription document, offering document, partnership agreement, risk disclosure or financial statement in connection with his investment, and no document of any kind evidencing his interest. The terms of the Venture were oral.

85. Although Michaels understood that Crockett traded on the Bybit exchange, Defendants did not disclose to him, before he transferred his 6 Bitcoin and 75 Ether, that United States persons are not permitted to trade on Bybit; that the accounts in which Crockett traded had been opened without identity verification and were accessed through a VPN that made Defendants' access appear to originate outside the United States, in order to evade that prohibition; that accounts of that kind could be frozen by the exchange; or that Michaels's assets would be commingled with Defendants' own.

**F. Distributions Begin, Then Stop; Michaels Purchases an Additional Interest for $5,000; Michaels Is Denied Information (2022–2024)**

86. On November 10, 2022, Crockett asked Michaels for the address of a cryptocurrency-exchange wallet so that Crockett could "whitelist" it on Bybit for withdrawals to Michaels, explaining that "bybit only allows withdrawals to exchanges (not hardware wallets) . . . I think it's probably how they reconcile the KYC stuff."

87. On November 15, 2022, Crockett sent Michaels $10,000 in USDC (a $20 test transfer followed by $9,980) and wrote, "I'll plan on sending $10K every month and we can iterate as necessary."

88. On December 1, 2022, Crockett sent Michaels $5,000 in USDC and wrote that it "woudl be nice to send you 5K on the first and on the 15th of every month like payroll." Crockett sent a further $5,000 on December 16, 2022.

89. Crockett sent Michaels $5,000 in USDC on January 16, 2023, and further USDC transfers on or about February 2, 2023 and in March 2023.

90. After March 2023, the regular distributions stopped. On April 26, 2023, Michaels acknowledged that Defendants were "keeping distributions on hold."

91. In April 2023, Crockett reported to Michaels the results of his trading of

stock-index futures: on April 15, 2023, that he had "turned $100 into $1,250 between Monday and yesterday," and on April 19, 2023, that he had "Got the ES account to $2K . . . 20X in 8 trading days." Crockett then sent Michaels instructions for transferring funds to Crockett's Bank of America account to be traded in a futures-trading account for the Venture.

92. On April 20, 2023, following those instructions, Michaels transferred an additional $5,000 to Crockett's Bank of America account to fund a futures-trading account for the Venture.

93. Defendants continued to report extraordinary trading results to Michaels. On April 24, 2023, Crockett wrote that on the first day of trading with Michaels's $5,000, "I made $937. That's fucking 18.7% in one day!" On May 3, 2023, Crockett wrote, "As of today, I officially doubled our ES account. Did it in 8 trading days, son!"

94. On May 31, 2023, Michaels asked Crockett by text message, "can you please give me an update on what CCM's [Crest Capital Management's] total bag is at? I really have no idea and it's stressing me out a bit." Defendants never provided Michaels with any written statement of the Venture's assets.

95. On September 23, 2023, Michaels told Crockett that he was "really struggling financially and will need to start taking money out of our thing." Crockett replied that he was "On track to get you a first payment on Monday 10/2." On October 2, 2023, Crockett wrote that he was "very, very close to crossing the bag threshold" and would send funds "this week."

96. On November 6, 2023, Crockett sent Michaels $5,000 in USDC.

97. In total, Michaels received approximately $30,000 to $40,000 in distributions from the Venture, all between November 2022 and November 2023. Michaels has received nothing since November 6, 2023.

98. Defendants never provided Michaels with an account statement, ledger, trade record or accounting for the Venture at any time.

**G. "Crest Capital," "Dr. B," and the One-Third Interest (2024–2025)**

99. On August 2, 2024, Michaels told Winston that he had "serious debts to pay and all my free capital is tied up with you guys," that a lender had called about repossessing his motorcycle, and that he had "years of back taxes to pay." Winston responded that Crockett was "taking his exam at the end of the month," that the "next steps on the incorporation" of the Venture were underway, that "i think the best path forward is a nevada org," that "I have everything drawn up and ready to go," and that "you'll see it in the next few weeks."

100. Nothing was incorporated in the following weeks or at any time thereafter.

101. On October 22 and 25, 2024, Winston told Michaels that she had met with a lawyer who would provide "proposals" to "set everything up, incorporate us, handle all the state filings, advise and do the taxes." No such engagement was ever shown to Michaels.

102. On November 20, 2024, Crockett wrote to Michaels: "Meeting with Dr. B on Saturday night, so we'll have a final funding amount this weekend," and "Will send you another disbursement before the end of the month." No disbursement was sent.

103. Defendants represented to Michaels that "Dr. B" was a wealthy investor who was close to Winston's family and who would invest millions of dollars in the Venture once it was incorporated and had obtained regulatory approval as a registered investment adviser. Michaels has never met or communicated with Dr. B.

104. Before Winston introduced Dr. B, the Venture was a two-sided arrangement between Michaels on one side and Crockett and Winston on the other, under which the profits remaining after the return of Michaels's capital and repayment of the Loan were to be shared equally.

105. In or about November 2024, Winston proposed that, because she had brought Dr. B and his capital to the Venture, the Venture should instead be owned by Michaels, Crockett and Winston in equal one-third shares. Michaels agreed (the "Crest Capital Agreement"). Defendants thereafter told Michaels that they had described him

to Dr. B as their third partner.

106. Under the Crest Capital Agreement, Michaels's 6 Bitcoin and 75 Ether remained in the Venture as his capital; Michaels became the owner of one-third of the Venture, including one-third of the profits and other benefits derived from managing Dr. B's capital and any other capital the Venture raised; Crockett retained sole control of trading and of the Venture's accounts; and Defendants undertook to organize the Venture as a legal entity, to register it as an investment adviser, to open a bank account to receive Dr. B's funds, and to document Michaels's interest.

107. In exchange for his one-third interest, Michaels gave up his right to one-half of the Venture's profits, agreed to leave his 6 Bitcoin and 75 Ether in Defendants' control rather than demand their return while the Venture was organized and funded, and agreed to continue to defer repayment of the Loan.

108. Defendants told Michaels that the Venture had to be structured around a registered investment adviser (an "RIA") before Dr. B's investment could be received; that Crockett was studying for and would take the Series 65 examination required to become a licensed investment adviser, which Winston told Michaels was scheduled for August 30, 2024; that only a licensed person could hold an ownership interest in the RIA, so that Crockett would own it outright; and that Michaels's one-third interest would be preserved through a subsidiary—as Winston put it in a text message on May 8, 2025, Defendants would "drop the subs"—that would receive the RIA's income and distributions.

109. After August 30, 2024, Defendants told Michaels that Crockett had passed the Series 65 examination. Michaels has searched the public databases of registered investment advisers and investment adviser representatives maintained by the Securities and Exchange Commission and the Financial Industry Regulatory Authority and has found no record of Crockett as a registered investment adviser or investment adviser representative, and no record of any investment adviser registered, or with a registration pending, under the name Crest Capital or any variant of it. On that basis, and on the basis

of Defendants' failure to produce any document concerning the RIA despite his requests, Michaels is informed and believes that no application for registration of the Venture as an investment adviser was ever filed with the California Department of Financial Protection and Innovation or the Securities and Exchange Commission, and that Crockett has never been licensed as an investment adviser.

110. On January 20, 2025, Michaels wrote to Defendants: "keep in mind I'm completely in the dark on this other than what I hear from you and my whole life is and has been riding on this for a long time." Crockett replied that Defendants were "good to go on everything we talked about terms wise" and were "starting docs next week." No documents were ever prepared or provided.

111. On March 6, 2025, Winston wrote that she would soon "have all the incorporation docs." On March 14, 2025, Winston told Michaels that she was "in the middle of a convo about opening the bank account we get funding into," and on March 17, 2025 confirmed that she had gone to the bank to do so. No incorporation documents and no bank account were ever shown to Michaels.

112. On April 1, 2025, Michaels wrote to Winston: "you said it would be done no later than March of this year. That was later changed to April 1, which was later changed to the week of April 1. And I could go back to countless missed dates that were promised but undelivered."

113. On April 9, 2025, Michaels wrote to Defendants that he was "OUT OF TIME." Crockett responded that Dr. B's investment was "just waiting in CA regulatory approval," that "The RIA could get approved anytime," and that "we are crushing it on a daily basis, and we have been super short on the S&P and Nasdaq all year." Winston separately assured Michaels that "everything is on track like it was last week" and that "if you need capital back ahead of that we can definitely scale out of positions and do what makes sense."

114. On May 8, 2025, Winston wrote that "steps are getting completed and we're only a few away from funding!!!!!!!!" and that "i can only imagine the RIA got approved

and were ready to drop the subs and then fund."

115. On May 26, 2025, Winston wrote that "we'll have our check on saturday" from Dr. B, and that she expected the amount to be "7," meaning $7 million.

116. On the night of June 1, 2025, Winston wrote to Michaels and Crockett, "I FUCKING GOT IT!!!! . . . just got the check . . . both checks . . . be ready to facetime." By video call that night, Winston displayed to Michaels a check in the amount of $7 million payable to Sean Crockett. When Michaels asked why the check was payable to Crockett personally, Defendants told him it was because of "RIA structural issues."

117. On or about June 14, 2025, at a lunch in Los Angeles, Defendants told Michaels that his share of the Venture's profits was $2 million and that it would be paid to him together with the return of his 6 Bitcoin and 75 Ether. Defendants presented the $2 million not as a projection but as the share of profits the Venture had earned for Michaels's account.

118. Between May and November 2025, Defendants told Michaels that Dr. B had given them a new Lincoln Aviator, luxury handbags, a membership at a private shooting range and other gifts, and that Dr. B intended to buy Michaels a Tesla Cybertruck as well.

119. Winston described her relationship with Dr. B to Michaels not as that of a fund manager to an investor but as a personal relationship from which she expected to inherit. On March 1, 2025, Winston wrote to Michaels that Dr. B was helping her mother with a family legal matter and that "my dream would be that my mom marries him and he's my new daddy . . . i'm manifesting that," adding, "and then crest will be the heir to the pistachio empire . . . a true conglomerate . . . hedge fund, consultancy, investment firm and pistachio farmers." On April 25, 2025, forwarding to Michaels a screenshot of a text message from Dr. B, she wrote, "and this is why the farmland will go to me . . . future pistachio queen of CA." On July 16, 2025, forwarding another, she wrote that she was "literally so close to being the pistachio princess of CA . . . i'm going to get some pistachio tattoos after it happens." Winston also told Michaels that Dr. B's children were

unworthy of him and that she, not they, was his real family and would be the heir to his fortune.

120. Winston told Michaels that she had access to Dr. B's money. On March 6, 2025, she told Michaels that she had paid a $20,000 retainer to the law firm representing her mother using Dr. B's American Express card. On April 10, 2025, she sent Michaels photographs of the front and back of Dr. B's American Express card, wrote, "i have his credit card," and sent a photograph of a purchase she had charged to it.

121. Winston relayed to Michaels confidences Dr. B had shared with her. She told Michaels that she and Dr. B communicated through Telegram "secret chat" and had to be "discreet." On May 8, 2025, she told him that she was on the telephone with Dr. B and "he's walking me through his plan to leave barb," his wife, and that "i need him to cool it tho until he can extricate cleanly."

122. The most private of the confidences Winston relayed concerned Dr. B's childhood. Winston told Michaels, orally and in writing, that Dr. B had confided in her that he had suffered serious abuse as a child. On May 16, 2025, she wrote to Michaels that Dr. B's discomfort around certain people was explained by "what he went through as a kid," and that it was "very understandable." The confidence was itself a representation: that Winston's relationship with Dr. B was so close that he had disclosed to her a fact of the most private kind, and that what she reported about him—his wealth, his intentions and his money—came from the same intimacy.

123. Defendants knew that Michaels had himself suffered abuse as a child. He had confided it to them, as two of his closest friends. Winston told Michaels that Dr. B, having suffered what Michaels had suffered, regarded Michaels—a man he had never met—as a kindred spirit, and she invoked that regard to explain why Dr. B wished to be present when Michaels's capital was returned to him and why he intended to give Michaels a Cybertruck.

124. The disclosure served Defendants' scheme in two ways, and Defendants intended both. First, it was proof of intimacy. A relationship in which Dr. B confided a

fact of that kind was a relationship in which his money, his gifts and his promises could be counted on—and so, Michaels was meant to conclude, could Winston's accounts of them: the $7 million check, the Lincoln Aviator, the $850,000 bonus, the Cybertruck, and the return of Michaels's capital at a meeting Dr. B wished to attend. Second, it bound Michaels to Dr. B, and through Dr. B to the Venture, by the one experience Defendants knew Michaels could not weigh with detachment. A benefactor who had suffered what Michaels had suffered, who regarded him as a kindred spirit and wanted to hold his hand when his money was returned, was not a man whose existence or wealth Michaels would question, and not a man whose venture Michaels would move against. Defendants chose that instrument because they knew it would work, and it did.

125. Defendants deployed Dr. B's history when Michaels was closest to acting. On November 4, 2025—after the October 3, October 4 and October 24 payment dates had passed, and after Michaels had disclosed his margin loan and six years of back taxes—Winston told Michaels that Dr. B had asked to be present for the transfer of his capital, "which is why i haven't sent it over yet," and that Dr. B wanted "to do it all together sun morning" (¶ 140). She asked, "is that okay with you?" and wrote that, although she was "happy to push back," Dr. B was "a sentimental man." Michaels answered, "I mean I think you already know the answer." Winston then wrote that Dr. B "just wants to be a part of it with his real kids"; that he "keeps asking about you" and "loves you because we love you"; that "i know you're going to have the most special relationship with him"; and that Dr. B "wants to set us up for success," "like no one did for him," "only abuse." Michaels replied, "And we know what that's like." Winston continued: Dr. B "said he loves us because he knows we'll pay it forward"; he "wants to hold your hand on sunday"; and "he said we are brother and sister because he will be our father in addition to the ones we had." Michaels wrote that he was "literally crying like a school girl right now," that Dr. B would "be like a father figure to me too I'm sure," and that "I'll get his back no matter what." He did not demand that his capital be sent that day. Dr. B did not appear on Sunday, November 9, 2025, or at any other time, and

no transfer was made (¶ 141).

126. Michaels is informed and believes that Dr. B had expressed no such regard for him. The facts on which that belief is based are these: Michaels has never met or communicated with Dr. B (¶ 103); the meeting at which Dr. B was to hold his hand did not take place; two weeks earlier, Winston had described Dr. B as a man she had "primed" (¶ 136); and six weeks later she reported that Crockett "wants to cut ties with Dr. B" (¶ 146). But whether or not Dr. B had said any of it, Defendants' purpose in repeating it to Michaels was the same: to use what Michaels had suffered as a child, and what they said Dr. B had suffered, to secure his trust in their account of Dr. B and his forbearance from demanding the return of his money. Michaels gave them both.

127. On July 7, 2025, Michaels asked Winston for "an estimated timeline on sending the $," explaining that he had "a mountain of debt I need to start paying down." Winston replied, "i'll calculate the exact date tonight and call you." No date was provided.

128. In or around August 2025, and in any event before September 19, 2025, Defendants told Michaels that, in addition to the return of his capital and his $2 million share of profits, he would receive a "bonus" of $850,000. Defendants told Michaels that the bonus came from Dr. B, and that it was being paid in recognition of the years Michaels had waited and in exchange for his continued forbearance while Defendants completed the funding of Crest Capital.

**H. Michaels Threatens to Act; Defendants Buy His Forbearance with Promises of Specific Sums on Specific Dates (2025)**

129. By September 2025, Michaels had been waiting more than eight years for repayment of the Loan and three years for the return of his capital, had received nothing from the Venture since November 2023, and had told Defendants repeatedly that he was out of time. When Michaels told Defendants, in writing, that he would pursue his rights if he was not paid, Defendants responded not with information about his assets, and not with a projection of how an investment might perform, but with promises that specific

sums would be paid to him on specific dates. Each time Michaels stood down. Each date passed without payment.

130. Michaels had already put Defendants on notice. On April 9, 2025, after Crockett promised to "pay you back all debts / investments plus interest," Michaels wrote: "If you are becoming my business adversary then fine, but we need to have a very different conversation about the terms of that return of capital." Crockett replied, "Not trying to be adversaries, my dude," and wrote that Defendants could "scale out of our long term positions and pay you back everything plus interest and additional profit."

131. On September 11, 2025, Michaels wrote to Defendants: "The three of us need to have a serious conversation about our partnership. When can we do that?" Winston responded that she and Crockett had been "at dinner with Dr. B's son and daughter in law." When Crockett asked why Michaels was upset, Michaels wrote: "I'm not treated like a real partner. I'm treated like someone who can be avoided," and that he remained "In the dark and with nothing to show for any of it." Winston replied that "the only time I haven't answered is when there is something that's preventing me from answering and something that's necessary for the partnership." Crockett replied, "How about now?" and then offered to talk "any time after 4pm on Sunday," adding, "This is the first I'm hearing about you wanting to have a serious convo about work." Neither Defendant provided any information about the Venture's assets or the status of Michaels's capital in that exchange. On September 18, 2025, Michaels wrote to Winston, "it's sept 18 now and I really need an update on money issues"; Winston replied, "let me calculate the exact date for you tomorrow."

132. On September 19, 2025, after Michaels told Defendants that he had taken out a margin loan, that he owed six years of back taxes, and that he was "on the phone with Umhofer," Crockett wrote, within fifteen minutes: "Your money with the extra bonus will hit my account on 10/3." Nothing was paid on October 3, 2025.

133. On October 1, 2025, Winston wrote, "we're on track for the 4th btw." Nothing was paid on October 4, 2025.

134. On October 21, 2025, Michaels asked Winston, "what day did you say I'd be able to get my $ out?" Winston replied, "24th!" Nothing was paid on October 24, 2025.

135. In late October 2025, in connection with a proposed real-estate acquisition that Michaels had brought to Defendants, Winston told Michaels that Dr. B would fund $500,000 and then approximately $4.5 million through the Venture, that Dr. B's funds had "to come to my account first" and "then i have to wire it," and, on October 27, 2025, that she had "$1200 in my bank account rn."

136. Winston also described to Michaels where Dr. B's money was coming from. On October 22, 2025, she wrote, "okay i have dr b primed." On October 27, 2025, she wrote that, of the money Dr. B was to contribute, "the remaining 4.5 he has to hide from barb his wife," that he would "move it from a farming account," and that "the issue is that dr b has positive pay on." On October 28, 2025, she wrote that Dr. B had "scrounged around last night and found 5m that he can hide from wifey," and that "they took off positive pay for me so each check will clear in 3 days."

137. On October 28, 2025, when Michaels offered to borrow $500,000 against his own building to fund the acquisition, Crockett told him not to, writing, "That's your last safety net right now," and Winston wrote, "we're not in the business of playing with our own money anymore."

138. On October 31, 2025, Winston wrote that Dr. B's $500,000 "should clear around 9pm and we can start the process early next week," and, in her next message, "i'll start sending out CB too." Michaels understood, and Winston intended him to understand, that "CB" referred to the transfer of Michaels's capital to his Coinbase account.

139. On November 3, 2025, Winston wrote that she was "gonna send the crypto out as soon as we get home!" and that it "should be around 5 or 6." Nothing was sent.

140. On November 4, 2025, Winston wrote that "dr b asked if he could be there when I did the CBtransfer [sic] with the additional 800k or whatever, which is why i

haven't sent it over yet. He said he wants to do it all together sun morning." The same day Winston asked Michaels to send a photograph of his driver's license so that Dr. B could order the Cybertruck, and had Michaels select a vehicle configuration.

141. On November 8, 2025, Winston told Michaels that the meeting with Dr. B at which his capital would be transferred would take place at the Sunset Tower Hotel at 2:15 p.m. on Sunday, November 9, 2025. On the morning of November 9, Winston asked Michaels to "calculate how much you owe in back taxes quickly," and when he answered, replied, "okay the higher the better." The meeting did not take place, and no transfer was made.

142. On November 20, 2025, Michaels asked Defendants to repurchase his Bitcoin and Ether at then-prevailing prices and asked when he would receive them. Winston replied that Defendants had "started DCA-ing [dollar-cost averaging] in the other week" and had "the plan of completing all the purchases and getting you everything on Sunday." Nothing was delivered on Sunday, November 23, 2025.

143. On November 26, 2025, Crockett offered to give Michaels "talking points for any potential 'Spanish Inquisition'" from Michaels's family over the Thanksgiving holiday about the status of his money.

144. Michaels relied on each of these promises. In reliance on them he did not commence litigation; did not seek a court order freezing the accounts in which his assets were held; did not authorize counsel to commence litigation until after the last promised date had passed; declined, at Defendants' urging, to borrow against his own building; and continued to defer payment of taxes and other obligations that he expected to pay from the promised sums, incurring interest and penalties on them.

**I.The December 14, 2025 Agreement**

145. On December 14, 2025, Michaels wrote to Winston: "I need you and Sean, my two business partners, to either commit to a date certain on retu[r]ning my capital to me or a full, written accounting of why you can't do so." In the same message he wrote: "I will not tolerate it anymore and will prepare to pursue my rights through other means

if I don't get immediate action from you guys." He asked that Defendants respond in writing and stated that he would no longer discuss the matter by telephone "unless it is being recorded so that no one misremembers anything and there is a clear record."

146. Winston responded in writing the same afternoon. She wrote that Crockett had delayed because of a Federal Reserve meeting and expected "a massive dump" in the cryptocurrency market; that Crockett "wants to cut ties with Dr. B"; and that "if we're operating in a world without Dr. B's capital, I think Sean would say that we can get you back your crypto on next Thursday, or we can get you back a larger amount with a greater return in the first week of January." She added: "You have my and Sean's permission to record any call we have at anytime, without asking beforehand."

147. Michaels replied: "I need you to commit to Thursday the 25th to return everything that is due to me, approximately $2.8M, in USDC and the Btc and eth amounts discussed (6btc and 75eth). Please confirm this." He added: "I do not agree to you returning my capital in January. I agree to December 25 and no later than that."

148. That evening Winston wrote: "we agreed on the 25th." Michaels asked: "So I can count on that 100%? . . . If not we are decidedly in litigation." Winston answered: "absolutely," and "i give you a date and my word."

149. The approximately $2.8 million referred to in the December 14, 2025 exchange consisted of the $2 million share of profits and the $850,000 bonus that Defendants had promised Michaels.

150. Winston made the December 14, 2025 commitment (the "December 14 Agreement") on her own behalf and, as her messages reflected, on Crockett's behalf and with his authority. Crockett confirmed the commitment on December 18, 2025, stating that "you will have your money on the 25th," and again on December 19, 2025.

151. In reliance on Defendants' commitment, Michaels refrained from commencing litigation or taking any other action to recover his assets before December 25, 2025.

**J. The December 17 and 18, 2025 Calls: Defendants Disclose Where Michaels's Assets Are**

152. On or about December 17, 2025, Michaels spoke by telephone with Winston, and on or about December 18, 2025, separately, with Crockett. Each Defendant consented to Michaels recording the calls: Winston had given written consent on December 14, 2025, and confirmed it on the call, and Crockett stated on the call, "I want to make sure that everything is recorded for you."

153. On the call, Winston gave Michaels a series of inconsistent statements about the location of his assets. She first stated that "The money that you gave us and that Sean has been trading, is in Sean's Bybit account." When Michaels reminded her that for months she had described transfers of his capital to Coinbase, she stated that those transfers were "the additional money that Dr B had agreed to give us." She then stated, "Your money is in Coinbase"; then, "Your money is in five minutes getting transferred to Coinbase"; then that the funds in Coinbase were in "a Coinbase pro account that has Dr B on it"; and then, "Your crypto is in a Bybit account."

154. Winston acknowledged on the call that "people from the US, are not supposed to be trading on Bybit," and that Defendants were "doing this from a VPN in Palau."

155. Winston agreed on the call to send Michaels account statements that day: "Yeah, I'll get it to you today." Later in the same call she stated that the statement was "sensitive until the 25th." No statement was ever sent. Winston also stated on the call that if December 25, 2025, passed without payment, "I support you in moving forward with litigation."

156. Winston also disclosed on the call that she and Crockett were "four months behind our rent," and that Michaels's "name is not on anything." She also addressed on the call why no entity had been formed for the Venture, describing Defendants' wish for "a clean slate of like OK now we don't . . . owe you money basically"; when Michaels responded that this had been precisely the problem, Winston said, "I take

accountability."

157. On his call with Michaels the following day, Crockett stated: "We trade on Bybit . . . We have 33 accounts . . . which is not allowed in the United States. It is a UAE company incorporated in the British Virgin Islands. We have non KYC accounts that we have to VPN into."

158. Crockett stated that Defendants "have had accounts frozen for weeks from multiple logins because we are not allowed to be trading on Bybit," and that he could not produce a statement that day because "I can't log in to 33 accounts."

159. Crockett stated that "you will have your money on the 25th" and that Michaels would have "all account statements prior to receiving your money on the 23rd or fourth," and later, "25th with 33 screenshots on the 24th so you can do your accounting on the money you get back on 25th." Crockett added, "I welcome a lawsuit on the 25th if you don't get your money back." Crockett ended the call repeating, "I fucked up. I fucked up."

160. In a second recorded call the same day, Crockett stated: "You will get your money on the 25th," and that he would provide "account pictures statements for each of the 33 accounts that you can see on, like, you know, 23rd 24th," and "if not the 25th then I will be expecting litigation."

161. Before December 17, 2025, Defendants had never told Michaels that his capital was held in 33 separate accounts; that those accounts were non-KYC accounts—accounts opened without the "know your customer" identity verification that exchanges require—on an exchange that does not permit United States customers, which Defendants accessed through a VPN in Palau in order to evade that restriction; that any of the accounts had been frozen; that any funds represented to be his were held in an account bearing Dr. B's name; or that Defendants were months behind on their rent.

**K. Defendants Fail to Perform and Cut Off Contact**

162. On December 18, 2025, Michaels wrote to Winston: "You promised me account statements yesterday and when you said you couldn't do it all because you

claimed yesterday there's like 30 accounts, another fact that was new to me, you said you needed more time. So we agreed you'd send everything to me today. Why aren't you responding to me?" No statements were sent.

163. On December 19, 2025, Michaels sent Defendants the wallet addresses to which his USDC, Bitcoin and Ether were to be returned. Crockett replied: "Confirmed. Thank you."

164. On December 24, 2025, Michaels asked Defendants repeatedly what time he should expect the promised account statements. At 4:17 p.m. Crockett replied, "Responding shortly, my dude."

165. At 8:37 p.m. on December 24, 2025, Crockett wrote to Michaels: "I haven't been able to get you what you need for today or for tomorrow — meaning I won't have the accounting for you in and I won't be able to send you your money on the 25th. I understand what that means in terms of you proceeding in the way you need to proceed to protect yourself."

166. Defendants did not deliver any account statement on December 23 or 24, 2025, and did not return any of Michaels's assets or pay any sum to him on December 25, 2025 or at any time since.

167. Beginning on the evening of December 24, 2025, Defendants stopped answering Michaels's calls and messages. By December 25, 2025, Michaels's calls to both Defendants went directly to voicemail. Michaels is informed and believes that Defendants blocked his telephone number.

**L. Demand**

168. On January 1, 2026, Michaels, through counsel, sent Defendants a written demand for the return of his assets, payment of the Loan with interest, payment of the promised return, and production of all account statements for the Venture, with deadlines of January 6 and 7, 2026.

169. Defendants did not respond to the demand and have not paid or returned anything.

### M. Delayed Discovery and Defendants' Continuing Assurances

170. At all times after September 2022, Defendants had exclusive possession and control of Michaels's 6 Bitcoin and 75 Ether and of every account in which those assets or their proceeds were held. Michaels had no access to any such account.

171. Michaels asked Defendants for information about the location, amount and status of his assets on repeated occasions, including on February 19, 2021, May 31, 2023, January 20, 2025, April 9, 2025, September 11, 2025, and December 14, 2025. On each occasion Defendants responded with assurances rather than information, including that updates would follow, that the Venture was "crushing it," that funding was imminent, and that his capital would be returned on a stated date.

172. Defendants' payment of distributions to Michaels between November 2022 and November 2023, their April 9, 2025 written promise to repay "all debts / investments plus interest," and their December 14, 2025 written commitment to return all of his assets on December 25, 2025, were each consistent with the existence and security of the assets and profits Defendants had described, and Michaels relied on them.

173. As Michaels's partners and fiduciaries, and as his close friends of many years, Defendants owed Michaels a duty of full and honest disclosure, and Michaels was entitled to rely, and did rely, on their statements without independent investigation.

174. Michaels did not discover, and in the exercise of reasonable diligence could not have discovered, before December 17, 2025, that his assets were held in 33 non-KYC accounts on an offshore exchange that does not permit United States customers, that accounts holding his assets had been frozen, that funds represented to be his were held in an account bearing Dr. B's name, or that Defendants were months behind on their rent. Michaels did not discover before December 24, 2025 that Defendants would not return his assets as promised.

175. Defendants acknowledged the Loan in writing on each of the dates alleged in paragraphs 54 through 65, and on most of those dates promised in writing to repay it.

176. For purposes of 28 U.S.C. § 1658(b), Michaels did not discover, and a

reasonably diligent plaintiff in his position could not have discovered, the facts constituting the violations alleged in the First through Third Causes of Action, including the facts showing that Defendants acted with the required state of mind, before December 17 and 18, 2025, when Defendants disclosed for the first time the location and condition of his assets, and December 24, 2025, when Crockett admitted that Defendants would neither account nor pay. Until then, every fact concerning the Venture's assets, accounts, results, structure and investor was within Defendants' exclusive knowledge; every inquiry Michaels made was answered with an assurance, a part performance or a new date; and Defendants, as Michaels's partners and fiduciaries, were persons on whose statements he was entitled to rely.

177. This action is commenced within two years of that discovery and within five years of each purchase of a security alleged in this Complaint.

## <u>FIRST CAUSE OF ACTION</u>

**(Violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b)—Untrue Statements and Omissions of Material Fact)**

**(Against Crockett, Winston, and Does 1 through 20)**

178. Michaels realleges and incorporates by reference paragraphs 1 through 177 above.

<u>The Securities</u>

179. Michaels's interest in the Venture, which he purchased on September 26 and 27, 2022 for 6 Bitcoin and 75 Ether and enlarged on April 20, 2023 for $5,000, and his one-third interest in the Venture as Crest Capital, which he acquired under the Crest Capital Agreement, are each a "security" within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), as an investment contract and as a certificate of interest or participation in a profit-sharing agreement.

180. Each interest was an investment contract. Michaels invested money—Bitcoin, Ether and dollars having a value that Defendants themselves acknowledged,

and, in the case of the Crest Capital Agreement, the surrender of one-half of the Venture's profits, the continued commitment of his capital and his forbearance—in a common enterprise in which his assets were pooled with Defendants' and traded together, so that his fortunes rose and fell with theirs and with the results of Crockett's trading. He invested with the expectation of profits. And those profits were to come entirely from the efforts of others: Crockett selected and executed every trade, controlled every account and wallet, and alone possessed the trading skill on which Defendants represented the Venture's returns depended, while Michaels had no role in trading, no access to any account, no documents evidencing his interest, and no practical ability to exercise control over the enterprise or to replace its manager (¶¶ 73, 81–84, 106).

181. Michaels's interest was a security whether it is characterized as an investment contract, as a participation in a profit-sharing agreement, or as an interest in a general partnership. Although Michaels, Crockett and Winston called themselves partners, Michaels's interest left him with none of the powers of a partner in fact: the arrangement distributed power as would a limited partnership, and Michaels was so dependent on what Defendants represented to be Crockett's unique trading ability that he could not replace Crockett or otherwise exercise meaningful partnership powers.

<u>The Purchases and the Sale</u>

182. Michaels purchased securities from Defendants within the meaning of Sections 3(a)(13) and 10(b) of the Exchange Act, 15 U.S.C. §§ 78c(a)(13) and 78j(b), on three occasions: (a) on September 26 and 27, 2022, when he transferred 6 Bitcoin and 75 Ether to the addresses Crockett designated in exchange for his interest in the Venture; (b) on April 20, 2023, when he transferred $5,000 to Crockett's account to fund a futures-trading account for the Venture and thereby enlarged his interest; and (c) in or about November 2024, when he entered into the Crest Capital Agreement and acquired a one-third interest in the Venture as Crest Capital. The Crest Capital Agreement was a "purchase" both because it was a contract to acquire a security and because it fundamentally changed the nature and risk of Michaels's investment—from a two-sided

trading arrangement in which he held one-half of the profits into a one-third interest in what Defendants described as a hedge fund with an anchor investor, a registered adviser and a corporate structure—and therefore required and reflected a new investment decision.

183. In addition and in the alternative, the December 14 Agreement, under which Defendants agreed to redeem Michaels's interest in the Venture by returning his 6 Bitcoin and 75 Ether and paying him approximately $2.8 million on December 25, 2025 in exchange for his forbearance, was a contract to sell and otherwise dispose of a security, and therefore a "sale" by Michaels within the meaning of Section 3(a)(14) of the Exchange Act, 15 U.S.C. § 78c(a)(14). Defendants' statements alleged in paragraphs 113 through 148 were made in connection with that sale.

<u>Defendants' Untrue Statements of Material Fact</u>

184. In connection with the purchases and the sale alleged above, Defendants, by the means and instrumentalities of interstate commerce alleged in paragraph 19, made the following untrue statements of material fact to Michaels. Each statement is identified by speaker, date and medium in the paragraphs cited, and each was made to induce Michaels to purchase, or to continue to hold and enlarge, the securities described above:

(a) *The trading-record statements*. In connection with the September 2022 purchase: Winston's statement by text message on December 27, 2020 that a wealthy relative had entrusted his portfolio to Crockett and that "Since Sean started managing his crypto portfolio he's up over 500%!"; Crockett's statement by text message on January 13, 2021 that he had "turned 1 eth to 7" and that "I only place bets when I get confirmation that a trend has started"; Crockett's statements by text message on October 17, 2021 that "Ishani and I have $100K in assets," that "That $100K started off as $10K," and that "I think I can double our bag every month"; and Crockett's statement by text message on March 26, 2022 that he had "made some gains" in his "trading bag" (¶¶ 61, 63, 66, 67).

(b) *The Venture-terms statements*. In connection with the September 2022 purchase: Crockett's statements by text message on February 19, 2021 that Michaels and Defendants would share trading profits equally and that Crockett would provide updates three times a week; and Defendants' statements in or about September 2022 that the Venture's profits would be applied first to return Michaels's 6 Bitcoin and 75 Ether, second to repay the Loan with interest, and thereafter shared, and that Defendants would keep Michaels informed of the Venture's positions and results. Each was a statement of Defendants' then-present intention that was untrue when made because Defendants did not intend to perform (¶¶ 70, 73).

(c) *The futures-trading statements*. In connection with the April 20, 2023 purchase: Crockett's statements by text message on April 15, 2023 that he had "turned $100 into $1,250 between Monday and yesterday" and on April 19, 2023 that he had "Got the ES account to $2K . . . 20X in 8 trading days"; and, in the days immediately after the purchase, his statements by text message on April 24, 2023 that "I made $937. That's fucking 18.7% in one day!" and on May 3, 2023 that he had "officially doubled our ES account. Did it in 8 trading days" (¶¶ 91, 93).

(d) *The Crest Capital statements*. In connection with the Crest Capital Agreement, and to induce Michaels to enter into it and to leave his capital in the Venture under it: Winston's statements by text message on August 2, 2024 that the "next steps on the incorporation" were underway, that she had "everything drawn up and ready to go," and that Michaels would "see it in the next few weeks"; Winston's statements by text message on August 2 and August 25, 2024 that Crockett would take the Series 65 licensing examination on August 30, 2024, after which "things will be completely different"; Winston's statements by text message on October 22 and 25, 2024 that she had met with a lawyer who would "set everything up,

incorporate us, handle all the state filings, advise and do the taxes"; Defendants' statements that Dr. B was a wealthy investor close to Winston's family who would invest millions of dollars in the Venture once it was incorporated and registered as an investment adviser; Crockett's statement by text message on November 20, 2024 that he was "Meeting with Dr. B on Saturday night, so we'll have a final funding amount this weekend"; Defendants' statements that the Venture had to be structured around an RIA, that only a licensed person could own the RIA, that Crockett would own it outright, and that Michaels's interest would be preserved through a subsidiary; Defendants' statement that Crockett had passed the Series 65 examination; and Crockett's statements by text message on January 20, 2025 that Defendants were "good to go on everything we talked about terms wise" and were "starting docs next week" (¶¶ 64, 99, 101–103, 108–110).

(e) *The 2025 funding, profit and payment statements*. In connection with the sale effected by the December 14 Agreement, and to induce Michaels to enter into it: Crockett's statements by text message on April 9, 2025 that Dr. B's investment was "just waiting in CA regulatory approval," that "The RIA could get approved anytime," and that "we are crushing it on a daily basis"; Winston's statement by text message on May 8, 2025 that Defendants were "only a few away from funding"; Winston's statement by text message on May 26, 2025 that "we'll have our check on saturday" in the amount of "7," meaning $7 million; Winston's display to Michaels by video call on June 1, 2025 of a check for $7 million payable to Crockett, and Defendants' statement that it was payable to Crockett only because of "RIA structural issues"; Defendants' statement at a lunch in Los Angeles on or about June 14, 2025 that Michaels's share of the Venture's profits was $2 million; Defendants' statements between May and November 2025

that Dr. B had given them a Lincoln Aviator, luxury handbags, a shooting-range membership and other gifts and intended to give Michaels a Tesla Cybertruck; Defendants' statement before September 19, 2025 that Michaels would receive a bonus of $850,000 from Dr. B; Crockett's statement by text message on September 19, 2025 that "Your money with the extra bonus will hit my account on 10/3"; Winston's statements by text message on October 1 and October 21, 2025 that Defendants were "on track for the 4th" and that Michaels could get his money out on the "24th!"; Winston's statements by text message on October 31, November 3 and November 4, 2025 that Dr. B's $500,000 "should clear around 9pm," that she would "start sending out CB," that she was "gonna send the crypto out as soon as we get home!" and that Dr. B had asked to be present "when I did the CBtransfer [sic] with the additional 800k"; Winston's statement by text message on November 8, 2025 that the transfer would take place at the Sunset Tower Hotel on November 9, 2025; Winston's statement by text message on November 20, 2025 that Defendants had "started DCA-ing in" to repurchase Michaels's Bitcoin and Ether; and Winston's statements by text message on December 14, 2025 that Crockett could "get you back your crypto on next Thursday" and that "we agreed on the 25th," "absolutely," and "i give you a date and my word" (¶¶ 113–118, 128, 132–134, 138–142, 146–148).

(f) *The asset-location statements*. During 2025 and before December 14, 2025, Winston described to Michaels transfers of his capital to Coinbase; on December 17, 2025, three days after the December 14 Agreement was made and while Michaels continued to forbear under it, Winston stated that "Your money is in Coinbase" and was "in five minutes getting transferred to Coinbase" (¶¶ 138, 153).

Why the Statements Were Untrue

185. Each of these statements was untrue when made, for the following reasons:

(a) Michaels is informed and believes, and on that basis alleges, that Crockett's trading did not produce the returns represented and that Defendants did not hold the assets they claimed to hold. The facts on which that belief is based are these: represented returns that would have multiplied Defendants' capital many times over produced no repayment of any part of a $375,000 loan over eight years; Defendants described themselves in February 2021 as "trading crypto to make rent"; Winston had "$1200 in my bank account" on October 27, 2025; Defendants were "four months behind our rent" in December 2025; accounts holding the Venture's assets had been "frozen for weeks"; and Defendants could not return even Michaels's original capital when it came due. The "wealthy relative" whose portfolio Crockett claimed to have increased by "over 500%" was, on information and belief, the same "Uncle Tim" whose yacht, private jet and work emergency had never existed (¶¶ 46–52).

(b) Defendants did not intend to perform the terms they stated. They never applied any profit to the return of Michaels's 6 Bitcoin and 75 Ether or to repayment of the Loan, never provided a single account statement in more than three years, and stopped providing even informal updates on the Venture's assets in 2023.

(c) Michaels is informed and believes, and on that basis alleges, that Crockett's futures trading did not produce the results represented. The facts on which that belief is based are these: Defendants never provided any statement of the futures account; the $5,000 was never returned and no profit from it was ever paid; and the facts alleged in subparagraph (a).

(d) Michaels is informed and believes, and on that basis alleges, that no entity was ever organized for the Venture; that no lawyer was engaged to organize

it; that no application for registration as an investment adviser was ever filed or approved; that Crockett was never licensed as an investment adviser; that no bank account was opened for the Venture; and that Dr. B never committed to invest the sums described. The facts on which that belief is based are these: despite Michaels's repeated requests over more than a year, Defendants never produced an organizational document, an engagement letter, a filing receipt, a bank statement or any correspondence with a regulator; Michaels's search of the public adviser databases disclosed no registration, and no pending registration, for Crockett or for the Venture; Winston told Michaels on December 17, 2025 that his "name is not on anything"; and on December 14, 2025 Winston proposed to return Michaels's assets "in a world without Dr. B's capital."

(e) Michaels is informed and believes, and on that basis alleges, that no check for $7 million from Dr. B was deposited to any account for the benefit of the Venture and that Dr. B did not invest the millions of dollars Defendants represented. The facts on which that belief is based are these: no part of any such investment ever reached Michaels or was ever shown to him; Winston had $1,200 in her bank account nearly five months after displaying the check; Defendants were four months behind on their rent six months after displaying it; and on December 14, 2025 Winston stated that Crockett "wants to cut ties with Dr. B." Winston's own account of Dr. B's money is inconsistent with the institutional investment Defendants described: nearly five months after displaying a $7 million check, she described Dr. B as having "scrounged around" for money he could "hide from wifey," to be moved "from a farming account" through her personal account before it could be wired on, and she described Dr. B himself as a man she had "primed" (¶¶ 119–121, 135–136). The Venture had not earned profits of $2 million for Michaels's account and had no basis on which to pay him a

bonus of $850,000: Defendants could not return even his original capital, and by Winston's own account on December 17, 2025 his money was in Crockett's Bybit account, then in Coinbase, then in an account bearing Dr. B's name. Michaels is informed and believes that Dr. B did not give Defendants the gifts described or, if he did, that they were benefits of the Venture's business that Defendants appropriated to themselves. The statements that Michaels would be paid on October 3, October 4, October 24, November 9, November 23 and December 25, 2025 were untrue statements of Defendants' present intention and ability: Defendants lacked the means to pay and knew it, did not intend to pay, and disclosed none of the facts alleged in subparagraph (a) when they made them; each date passed with a new excuse; three days after giving "my word," Winston could not say where the assets were; Crockett could not log in to the accounts to produce a statement; and on December 24, 2025 Crockett admitted that Defendants would neither account nor pay. Michaels is informed and believes that Defendants had not "started DCA-ing in" to repurchase his Bitcoin and Ether: nothing was delivered, no purchase record was ever shown, and on December 17, 2025 Defendants stated that his crypto was in a Bybit account.

(f) Michaels's assets were not in Coinbase and were not being transferred to him. By Defendants' own account on December 17 and 18, 2025, the assets were held in 33 non-KYC accounts on an offshore exchange that does not permit United States customers, accessed through a foreign VPN, some of them frozen; on the December 17 call Winston conceded that the transfers to Coinbase she had described during 2025 as movements of Michaels's capital were not of his funds; and Defendants made no transfer to Michaels on any date.

Defendants' Omissions of Material Fact

186. Defendants also omitted to state material facts necessary in order to make the statements they made, in the light of the circumstances under which they were made, not misleading. Defendants had a duty to disclose those facts because they spoke to Michaels about the Venture's trading, structure, funding, assets and imminent payment while omitting the facts that made what they said misleading; because the omitted facts were within Defendants' exclusive knowledge and were not reasonably available to Michaels; and because, from September 2022 forward, Defendants were Michaels's partners and fiduciaries. The omitted facts include:

(a) that United States persons are not permitted to trade on Bybit; that the accounts in which the Venture's assets were held were non-KYC accounts opened without identity verification; and that Defendants accessed those accounts through a VPN routed through Palau in order to evade the exchange's prohibition;

(b) that the Venture's assets, including Michaels's capital and its proceeds, were spread across 33 separate accounts, so that no statement of them could readily be produced;

(c) that accounts holding Michaels's assets had been frozen by the exchange, in some instances for weeks;

(d) that Michaels's capital and its proceeds were commingled with Defendants' own funds and with funds Defendants attributed to Dr. B, and that funds represented to be Michaels's were held in a Coinbase Pro account bearing Dr. B's name;

(e) that no entity had been organized for the Venture, no application for its registration as an investment adviser had been filed, no bank account had been opened for it, and Crockett was not a licensed investment adviser;

(f) that Defendants depended on the Venture's assets and trading for their own living expenses, had "$1200" in the bank in October 2025, and were months

behind on their rent, and therefore lacked the means to return Michaels's assets or to pay the sums they had promised;

(g) that the transfers to Coinbase that Winston described to Michaels during 2025 as movements of his capital were not of his funds;

(h) that Defendants intended to "cut ties" with Dr. B, the investor whose funding they had represented as the basis for Crest Capital and for Michaels's $2 million return; and

(i) that Defendants could not, and did not intend to, return Michaels's assets or pay the sums they had promised on the dates they gave him.

<u>Materiality</u>

187. Each of the untrue statements and omitted facts alleged above was material. A reasonable investor deciding whether to entrust his assets to Crockett's trading, whether to accept a one-third interest in Crest Capital in place of one-half of the Venture's profits, whether to leave his assets in Defendants' control, and whether to accept a promised date of payment in place of immediate action to recover his assets would have considered each of them important, and each significantly altered the total mix of information available to Michaels.

<u>Scienter</u>

188. Defendants made each untrue statement and omission knowingly or, at a minimum, with deliberate recklessness. The following facts, among others, give rise to a strong inference that Defendants acted with the required state of mind:

(a) Each statement concerned Defendants' own trading results, accounts, finances, filings and dealings with Dr. B—matters they necessarily knew. Crockett knew what his trading had produced and where the Venture's assets were held. Winston knew whether she had incorporation documents, had engaged a lawyer, had opened a bank account, or had received a check. Both knew whether Crockett had taken or passed a licensing examination and whether any application had been filed with any regulator.

(b) Over six years Defendants gave Michaels at least fourteen specific dates for repayment of the Loan or the return of his capital and met none of them, and between September 19 and December 14, 2025 alone they gave him six. A pattern of that length and regularity is not consistent with honest error.

(c) Defendants' statements were contradicted by their own words within days. On December 14, 2025 Winston gave "my word" that everything would be returned on December 25; on December 17 she gave five inconsistent accounts of where Michaels's assets were, and on December 18 Crockett stated that he could not log in to the 33 accounts that held them; on December 24 Crockett admitted that Defendants would neither account nor pay.

(d) When Defendants promised in the fall of 2025 to pay Michaels approximately $2.8 million and return his 6 Bitcoin and 75 Ether, they knew their own financial condition: Winston had "$1200 in my bank account" on October 27, 2025; Defendants were "four months behind our rent"; and accounts holding the Venture's assets had been "frozen for weeks." They disclosed none of it.

(e) Defendants' conduct reflects consciousness of the falsity of their statements: they accepted, by their own account, a $7 million investment in the Venture by a check payable to Crockett personally; they held the Venture's assets in non-KYC accounts accessed through a foreign VPN in order to evade the exchange's prohibition on United States customers; they dissuaded Michaels from borrowing against his own building, telling him it was his "last safety net"; they offered him "talking points" for his family's questions about his money; on the morning of the meeting at which his capital was to be transferred they asked him to calculate his back taxes, "the higher the better"; and, when the last promised date arrived, they cut off all

communication and ignored a written demand.

(f) Defendants had a motive to deceive. By their own account they were "trading crypto to make rent" in 2021, were months behind on their rent in 2025, and depended on the assets in Crockett's trading accounts—which, by Winston's account on December 17, 2025, included "[t]he money that you gave us and that Sean has been trading"—for their own support. When Michaels told Winston on August 25, 2024 that "using my money to fund your lives" appeared "totally acceptable to you," Winston did not deny it. Returning Michaels's capital, or disclosing where it was and what had become of it, would have deprived Defendants of the assets on which they lived.

(g) The representations concerning the licensing examination and the RIA were of a kind whose truth Defendants knew and could easily have documented, yet for more than a year they told Michaels that the RIA "could get approved anytime" while producing nothing.

(h) Defendants had used the same device before. In 2019 they told Michaels that a wealthy relative, "Uncle Tim," had invited him on a two-week Mediterranean cruise aboard a famous yacht and had arranged a private jet to carry him there; they managed the invitation through an "assistant" whom no one met; they asked Michaels to keep the uncle's role secret; and when the day came they postponed the trip for a "work emergency" and offered the guests consolation gifts. On information and belief, no yacht, jet or uncle existed. The "Dr. B" narrative of 2024 and 2025—a wealthy benefactor whom Michaels never met, whose generosity was always imminent and whose affairs explained every delay—followed the same pattern, and Defendants' repetition of it supports a strong inference that they knew the second narrative to be false, as they had known the first (¶¶ 46–52).

(i) Winston's own words show that she regarded Dr. B's money as something to be extracted rather than invested. She told Michaels that she expected to become Dr. B's heir—the "future pistachio queen of CA"—that she held and used his credit card, that she had him "primed," and that the funds he was to contribute were funds he had to "hide from" his wife. Those statements cannot be reconciled with Defendants' representations to Michaels that Dr. B was an arm's-length investor funding a registered fund through a corporate structure, and Winston knew it when she made them (¶¶ 119–121, 136).

(j) Defendants' choice of means confirms their intent. To secure Michaels's trust in the Dr. B narrative and his continued forbearance, Defendants told him that Dr. B had suffered abuse as a child, as they knew Michaels had, and that Dr. B regarded him as a kindred spirit—and they deployed that account on November 4, 2025, in the same exchange in which they explained why his capital had not been sent. The selection of the one subject on which Defendants knew Michaels was least able to be skeptical is not the conduct of persons who believed what they were telling him (¶¶ 122–126).

<u>Reliance</u>

189. Michaels actually and justifiably relied on Defendants' untrue statements and on the completeness of what they told him. In reliance on the trading-record and Venture-terms statements he transferred 6 Bitcoin and 75 Ether to Defendants in September 2022. In reliance on the futures-trading statements of April 15 and 19, 2023 he transferred $5,000 on April 20, 2023, and in reliance on those of April 24 and May 3, 2023 he left it in Defendants' hands. In reliance on the Crest Capital statements he entered into the Crest Capital Agreement and left his capital in the Venture. In reliance on the 2025 funding, profit and payment statements and the asset-location statements he entered into the December 14 Agreement and forbore from suit. Michaels dealt with

Defendants directly. His reliance was reasonable: Defendants were his closest friends of nearly twenty years, who called him family and who cultivated his trust deliberately, including by exploiting what he had confided to them about his childhood (¶¶ 122–126); from September 2022 they were his partners and fiduciaries; they alone possessed the assets and had access to every account, document and counterparty; their statements were accompanied by part performance in the form of distributions and by repeated written commitments; and Michaels had no practical means of verifying what they told him.

Economic Loss and Loss Causation

190. Michaels suffered economic loss. He has lost his 6 Bitcoin and 75 Ether, which were worth approximately $215,000 when he transferred them and are worth substantially more today, and his $5,000; he has received nothing on the one-third interest he acquired under the Crest Capital Agreement; and he has lost the use of his capital for more than three years.

191. Defendants' untrue statements and omissions caused Michaels's loss. The loss did not result from market forces or from the ordinary risks of cryptocurrency trading. It resulted from the very facts Defendants misrepresented and concealed: Michaels's assets were not held in a hedge fund managed by a licensed adviser and anchored by a wealthy investor, but in dozens of unverified accounts on an offshore exchange that does not permit United States customers, accessed by VPN, commingled with Defendants' own funds, subject to freezing and beyond Michaels's reach; the trading results and the funding that were to return his capital and pay his profits did not exist; and when the concealed facts came to light in December 2025, Defendants could not return even his original capital. Had Defendants told the truth at any point, Michaels would not have purchased the securities, would have demanded the return of his assets while they could still be returned, and would not have forborne.

Damages and Timeliness

192. Michaels is entitled to recover from Defendants, jointly and severally, his

actual damages under Section 28(a) of the Exchange Act, 15 U.S.C. § 78bb(a), including rescissory damages measured by the value of the consideration he paid for the securities, or in the alternative his out-of-pocket loss, in an amount to be proven at trial, together with prejudgment interest.

193. This cause of action is timely under 28 U.S.C. § 1658(b). It is brought within two years after Michaels discovered the facts constituting the violation, which he did not and could not have discovered before December 17 and December 24, 2025, for the reasons alleged in paragraphs 170 through 176, and within five years after each violation, the earliest of which occurred on September 26, 2022.

194. The safe harbor for forward-looking statements under Section 21E of the Exchange Act, 15 U.S.C. § 78u-5, does not apply to Defendants, who are not issuers subject to the reporting requirements of the Exchange Act or persons acting on behalf of such an issuer, and does not apply to the statements alleged above, which were statements of present or historical fact, or statements of Defendants' then-present intention, and were not accompanied by meaningful cautionary language.

## **SECOND CAUSE OF ACTION**

**(Violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(a) and (c), 17 C.F.R. § 240.10b-5(a), (c)—Scheme to Defraud)**

**(Against Crockett, Winston, and Does 1 through 20)**

195. Michaels realleges and incorporates by reference paragraphs 1 through 177 above.

196. In connection with the purchases and the sale of securities alleged in paragraphs 182 and 183, Defendants, directly and indirectly, by the means and instrumentalities of interstate commerce alleged in paragraph 19, knowingly or with deliberate recklessness employed devices, schemes and artifices to defraud Michaels, and engaged in acts, practices and a course of business that operated as a fraud and deceit upon him, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

197. Defendants' scheme was to obtain and keep control of Michaels's assets for their own use by creating and maintaining the appearance of a successful trading venture on the verge of becoming an institutional fund—first a partnership, then a hedge fund—while concealing the true location, condition and results of the assets, and to prevent Michaels from discovering the fraud or recovering his assets by supplying a continuous stream of part performances, staged events, excuses and promised dates. In addition to the untrue statements alleged in the First Cause of Action, the deceptive acts in furtherance of the scheme included:

(a) reporting to Michaels trading gains that, on information and belief, were fictitious or grossly overstated—a portfolio "up over 500%," "1 eth to 7," "20X in 8 trading days," "18.7% in one day," "crushing it on a daily basis"—and that Michaels had no means of verifying;

(b) taking custody of Michaels's assets in non-KYC accounts on an exchange that does not permit United States customers, accessing those accounts through a foreign VPN to evade that prohibition, spreading the assets across 33 accounts, and commingling them with Defendants' own funds and with funds attributed to Dr. B, so that no statement of the assets could be produced—as Crockett said, "I can't log in to 33 accounts"—and no third party could verify their existence;

(c) paying Michaels approximately $30,000 to $40,000 in small "distributions" between November 2022 and November 2023, described as "payroll," to create the appearance of a profitable enterprise and to induce Michaels to enlarge his interest in April 2023 and to leave his assets in place;

(d) constructing the "Crest Capital" narrative—a Nevada entity that was "drawn up and ready to go," a lawyer who would "incorporate us," a licensing examination, a pending RIA application, a plan to "drop the subs," and a bank account that was being opened—when, on information and belief, none of those things existed;

(e) constructing the "Dr. B" narrative—an anchor investor whom Michaels was never permitted to meet, a $7 million check displayed by video call and made payable to Crockett personally, an account of lavish gifts, an account of Dr. B's childhood, matched to what Defendants knew of Michaels's own, that cast Dr. B as a kindred spirit and father figure to a man he had never met, a promised Tesla Cybertruck for which Michaels was asked to supply his driver's license and select a configuration, and a meeting at the Sunset Tower Hotel on November 9, 2025 at which Michaels's capital was to be handed over—to explain why Michaels's capital was not yet available and to persuade him that it soon would be;

(f) inserting themselves into a real-estate transaction that Michaels had brought to them, representing that Dr. B would fund it through the Venture, and dissuading Michaels from borrowing against his own building to fund it himself, telling him that the building was "your last safety net";

(g) giving Michaels a rolling series of payment dates—October 3, October 4, October 24, November 9, November 23 and December 25, 2025—each accompanied by an excuse Michaels could not verify and that placed the cause of delay outside Defendants' control;

(h) offering Michaels "talking points" to deflect his family's questions about his money;

(i) promising account statements—"today," on "the 23rd or fourth," "33 screenshots on the 24th"—while describing them as "sensitive until the 25th" and never producing one; and

(j) cutting off all communication with Michaels when the last promised date arrived, blocking his telephone number on information and belief, and ignoring his counsel's written demand.

198. Each Defendant participated in the scheme and is liable as a primary violator of Rule 10b-5(a) and (c). Each personally made and disseminated false

statements and staged deceptive events with the intent to defraud, and each performed acts without which the scheme could not have operated: Crockett in controlling the Venture's accounts and trading, reporting its results, and giving and confirming payment dates that were then missed; Winston in constructing and conveying the Crest Capital and Dr. B narratives, displaying the check, relaying the excuses, and giving her "word" on December 14, 2025.

199. Defendants acted with scienter, for the reasons alleged in paragraph 188 and because the staged events alleged above—the display of a check payable to Crockett, the ordering of a Cybertruck with Michaels's driver's license, the scheduling of a meeting that did not occur—cannot have been undertaken innocently, and because Defendants had staged the same kind of event for Michaels before, in the 2019 yacht trip that never was (¶¶ 46–52).

200. The scheme was carried out in connection with Michaels's purchases of securities in September 2022, April 2023 and under the Crest Capital Agreement, and in connection with the sale effected by the December 14 Agreement. Its deceptive acts induced those transactions and were designed to conceal the fraud committed in connection with them, to prevent Michaels from discovering it, and to prevent him from recovering the consideration he had paid.

201. Michaels relied on the scheme's deceptive acts, including the distributions, the display of the check, and the arrangement of the November 9, 2025 meeting, in purchasing and continuing to hold the securities and in entering into the December 14 Agreement. Because the scheme operated primarily through the concealment of material facts by persons who had a duty to disclose them, Michaels's reliance is also presumed.

202. The scheme caused Michaels the economic loss alleged in paragraphs 190 and 191, and Michaels is entitled to recover his actual damages, jointly and severally, as alleged in paragraph 192. This cause of action is timely for the reasons alleged in paragraph 193.

## THIRD CAUSE OF ACTION

**(Violation of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a)—Control Person Liability)**

**(Against Crockett and Winston)**

203. Michaels realleges and incorporates by reference paragraphs 1 through 177 above.

204. This cause of action is pleaded in the alternative to the First and Second Causes of Action as to each Defendant, in the event that either Defendant is found not to be a primary violator with respect to any statement or act alleged in those causes of action.

205. Crockett and Winston each controlled the other, and each controlled the Venture, within the meaning of Section 20(a) of the Exchange Act. They were spouses who jointly owned and operated the Venture and held it out to Michaels as their joint enterprise. Winston made statements to Michaels concerning the Venture on Crockett's behalf and with his authority, and Crockett directed Michaels to raise financial matters with Winston. Crockett controlled the Venture's trading and every account in which its assets were held; Winston controlled the Venture's dealings with Dr. B and the organizational and funding steps that Defendants represented were underway. Each possessed the power to direct or cause the direction of the management and policies of the Venture and of the other's statements and conduct concerning it.

206. By virtue of that control, each of Crockett and Winston is jointly and severally liable under Section 20(a) for the other's violations of Section 10(b) and Rule 10b-5, to the same extent as the primary violator. Each was a culpable participant in those violations: each knew of and participated in the statements and acts alleged in the First and Second Causes of Action, and neither acted in good faith or without knowledge of the facts that made those statements and acts wrongful.

207. As a direct and proximate result, Michaels has been damaged in the amounts alleged in paragraphs 190 through 192.

**FOURTH CAUSE OF ACTION**

**(Violation of California Corporations Code Sections 25401, 25501, 25504 and 25504.1)**

**(Against Crockett and Winston)**

208. Michaels realleges and incorporates by reference paragraphs 1 through 177 above.

209. Michaels's interest in the Venture, and his one-third interest in the Venture as Crest Capital, were each a "security" within the meaning of Corporations Code section 25019. Michaels invested his 6 Bitcoin and 75 Ether, and later $5,000, in a common enterprise managed by Crockett, with the expectation of profits to be derived from the efforts of Crockett and Winston, and he later exchanged one-half of the Venture's profits, the continued commitment of his capital and his forbearance for a one-third interest in what Defendants described as a hedge fund. Michaels had no role in the Venture's trading, no access to any account, wallet or exchange in which its assets were held, no documents evidencing his interest, and no practical ability to exercise control over the enterprise; he was wholly dependent on Crockett's and Winston's management and on the trading expertise Crockett claimed. Each interest was a security whether it is characterized as an investment contract, as a certificate of interest or participation in a profit-sharing agreement, or as an interest in a partnership in which Michaels was a passive investor wholly dependent on the managerial efforts of others.

210. Crockett and Winston offered and sold the securities to Michaels in California in or about September 2022, in exchange for his 6 Bitcoin and 75 Ether; in April 2023, in exchange for his $5,000; and in or about November 2024, under the Crest Capital Agreement.

211. Crockett and Winston offered and sold the securities by means of written and oral communications that included untrue statements of material fact and omitted material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, including the statements

alleged in paragraph 184, subparagraphs (a) through (d), and the following:

(a) that Crockett had increased a relative's portfolio by "over 500%" and had "turned 1 eth to 7";

(b) that Defendants held "$100K in assets," grown from $10,000, and that Crockett could "double our bag every month";

(c) that Michaels and Defendants would share trading profits equally and that Defendants would provide regular updates;

(d) that the Venture's profits would be applied first to return Michaels's Bitcoin and Ether and second to repay the Loan, and that Defendants would keep him informed of the Venture's positions and results;

(e) that Crockett had "turned $100 into $1,250" and made "20X in 8 trading days" trading stock-index futures; and

(f) that the Venture would be organized as a legal entity and registered as an investment adviser, that Crockett would be licensed to operate it, that Dr. B would invest millions of dollars in it, and that Michaels's one-third interest would be preserved and documented.

212. Crockett and Winston omitted to disclose the facts alleged in paragraph 186, and further omitted to disclose that, on information and belief, Crockett's trading had not produced the returns represented; that the Venture's assets would be held in non-KYC accounts on an exchange that does not permit United States customers, accessed by VPN, and would be subject to freezing; that Defendants had no means of, and no intention of, providing Michaels with account statements or an accounting; that Michaels's capital would be commingled with Defendants' own funds and those of third parties; and that no entity, registration, license or bank account existed for the Venture.

213. Michaels did not know of the untrue statements and omissions when he purchased the securities, and did not discover them until December 17, 2025.

214. Under Corporations Code section 25501, Michaels is entitled to rescind his purchases of the securities and to recover the consideration he paid—6 Bitcoin, 75 Ether

and $5,000, or their value, together with the value of the one-half profit interest he surrendered under the Crest Capital Agreement—with interest at the legal rate from the dates of purchase, less the amount of any income received on the securities, upon tender of the securities, which Michaels hereby offers to tender. In the alternative, Michaels is entitled to damages as provided in section 25501.

215. Each of Crockett and Winston is jointly and severally liable with the other under Corporations Code sections 25504 and 25504.1 as a person who directly or indirectly controlled the seller, as a partner and principal in the Venture who materially aided in the transactions, and as a person who materially assisted in the violations with the intent to deceive or defraud.

216. This cause of action is brought within five years of each sale and within two years of Michaels's discovery of the facts constituting the violation, as required by Corporations Code section 25506, subdivision (b).

**FIFTH CAUSE OF ACTION**

**(Fraud—Intentional Misrepresentation, Civil Code §§ 1709, 1710(1))**

**(Against Crockett, Winston, and Does 1 through 20)**

217. Michaels realleges and incorporates by reference paragraphs 1 through 177 above.

218. Defendants made the following representations of fact to Michaels, each of which is alleged with particularity—by speaker, date and medium—in the paragraphs cited:

(a) *The Astralo representations*. To induce the Loan, and while Michaels was advancing it, Crockett and Winston represented that Astralo was about to sign contracts with large medical practices and hospital systems that would produce tens of millions of dollars in recurring revenue, and that the Loan was therefore at no risk of non-repayment; that an account Crockett displayed on his phone, which purported to hold approximately $15 million, was a trust fund belonging to Winston; and that the trust stood behind the

Loan. Defendants repeated these representations in writing: on May 26, 2019, that Astralo had "85M in contract value over 5 yrs" and a customer prepared to pay by cashier's check; on June 2, 2019, that they were "picking up the check"; on January 20, 2021, that Astralo "had signed contracts for over 10M of ARR"; on February 1, 2021, that Defendants "literally have a trust with 10s of Ms in it"; and on March 6, 2021, that "the trust and Nitin, that is all real too" (¶¶ 26–28, 40–41).

(b) *The trading representations*. Between December 2020 and May 2023, Defendants represented that Crockett had increased a relative's cryptocurrency portfolio by "over 500%"; that Crockett had "turned 1 eth to 7" and placed trades only on confirmed trends; that Defendants held "$100K in assets," grown from $10,000, and were "trading all of it" to repay the Loan; that Crockett had "turned $100 into $1,250" and made "20X in 8 trading days" trading stock-index futures; and that Crockett had earned "18.7% in one day" on Michaels's $5,000 and had "doubled our ES account" in eight trading days (¶¶ 61, 66–67, 91, 93).

(c) *The Venture-status and licensing representations*. Between August 2024 and May 2025, Defendants represented that Winston had the Venture's incorporation documents "drawn up and ready to go"; that Winston had met with a lawyer who would incorporate the Venture and handle its filings and taxes; that Defendants were "starting docs next week"; that Winston would shortly have "all the incorporation docs" and had gone to a bank to open the account into which the Venture's funding would be paid; that the Venture had to be structured around a registered investment adviser, that only a licensed person could hold an ownership interest in the RIA, and that Michaels's one-third interest would be preserved through a subsidiary; that Crockett had passed the Series 65 examination required to become a licensed investment adviser; that the Venture's registration as an

investment adviser was pending before California regulators and "could get approved anytime"; and that Winston expected that "the RIA got approved" and Defendants "were ready to drop the subs and then fund" (¶¶ 99, 101, 108–111, 113–114).

(d) *The Dr. B and funding representations*. Between November 2024 and November 2025, Defendants represented that a wealthy investor would invest millions of dollars in the Venture; that Dr. B had delivered a check for $7 million, which Winston displayed to Michaels by video call, and that the check was payable to Crockett personally only because of "RIA structural issues"; that Michaels's share of the Venture's profits was $2 million and that he would also receive a bonus of $850,000 from Dr. B; that Dr. B had given Defendants an automobile, luxury handbags, a shooting-range membership and other gifts and intended to give Michaels a Tesla Cybertruck; that Dr. B would fund $500,000 and then approximately $4.5 million through the Venture for a real-estate acquisition, and that his $500,000 "should clear around 9pm" on October 31, 2025; and that Dr. B had asked to be present when Michaels's capital and "the additional 800k" were transferred to him on November 9, 2025 (¶¶ 102–103, 115–118, 128, 135, 138, 140–141).

(e) *The asset-location representations*. During 2025, Winston described to Michaels transfers of his capital to Coinbase; on November 20, 2025, Winston represented that Defendants had "started DCA-ing in" to repurchase Michaels's Bitcoin and Ether; and on December 17, 2025, Winston represented that "Your money is in Coinbase" and was "in five minutes getting transferred to Coinbase" (¶¶ 138, 142, 153).

(f) *The present-ability representations*. On each occasion between September 19 and December 14, 2025 on which Defendants told Michaels that a specific sum would be paid to him on a specific date—October 3, October

4, October 24, November 9, November 23 and December 25, 2025—they impliedly and expressly represented, as a matter of present fact, that they then had the assets and the ability to make the payment and that nothing they knew stood in its way (¶¶ 132–134, 138–142, 146–148).

219. Each of these representations was false when made:

(a) Astralo had no such contracts or revenue and never obtained them, and Defendants had wound it down by 2021. No trust of the kind represented existed; none was ever produced or drawn upon; and Crockett did not deny its non-existence when confronted with it.

(b) Michaels is informed and believes that Crockett's trading did not produce the returns represented and that Defendants did not hold the assets they claimed to hold. Notwithstanding represented returns that would have multiplied Defendants' capital many times over, Defendants never repaid any part of a $375,000 loan, had "$1200" in the bank in October 2025, were "four months behind" on their rent in December 2025, and could not return even Michaels's original capital.

(c) Michaels is informed and believes that no entity was ever organized for the Venture, that no lawyer was engaged to organize it, that no application for registration as an investment adviser was submitted or approved, that Crockett never became a licensed investment adviser, and that no bank account was opened for the Venture. None was ever shown to Michaels despite his requests, and Michaels's search of the public adviser databases disclosed no registration and no pending registration for Crockett or for the Venture (¶ 109).

(d) Michaels is informed and believes that no check for $7 million from Dr. B was deposited to any account for the benefit of the Venture, that Dr. B never invested the millions of dollars Defendants represented he would invest, and that Dr. B did not commit to fund a real-estate acquisition, to pay

Michaels a bonus, or to give Michaels a Cybertruck. The meeting at which Dr. B was to appear and Michaels's capital was to be transferred did not take place, and on December 14, 2025 Winston stated that Crockett "wants to cut ties with Dr. B" and proposed to return Michaels's assets "in a world without Dr. B's capital." The Venture had not earned profits of $2 million for Michaels's account and had no basis on which to pay him a bonus of $850,000: Defendants could not return even his original capital. Winston's own description of Dr. B's funds—money he had to "hide from barb his wife," money he had "scrounged around" to find, money to be moved "from a farming account" through her personal account—and her description of Dr. B as a man she had "primed" are inconsistent with the arm's-length, multimillion-dollar investment Defendants represented.

(e) Michaels's assets were not in Coinbase and were not being transferred to him. By Defendants' own account, given in the days after Winston gave "my word," the assets were held in 33 non-KYC accounts on an offshore exchange that does not permit United States customers, accessed through a foreign VPN, some of them frozen. On the December 17 call Winston conceded that the transfers to Coinbase she had described to Michaels during 2025 as movements of his capital were not of his funds. Defendants made no transfer to Michaels on any date.

(f) Defendants did not have the assets or the ability to pay the promised sums on any of the promised dates. When they gave those dates, Winston had "$1200 in my bank account," Defendants were months behind on their rent, accounts holding the Venture's assets had been "frozen for weeks," and Crockett could not log in to the accounts to produce a statement. Defendants disclosed none of this when they gave each date.

220. Defendants knew that each representation was false when they made it, or made it recklessly and without regard for its truth. Each representation concerned

Defendants' own company, finances, trading, accounts, filings, licensing or dealings with Dr. B—matters within their exclusive knowledge and outside Michaels's. Crockett knew what the account he displayed on his phone was and whether Winston held a trust. Crockett knew whether he had taken and passed a licensing examination. Winston knew whether she had incorporation documents, had engaged a lawyer, had opened a bank account, or had received a check. Defendants knew at all times where Michaels's assets were held, that the accounts were non-KYC accounts accessed by VPN, that some of them were frozen, and what their own bank balances were. And Winston knew, when she told Michaels on December 17, 2025 that his money was in Coinbase, that it was not, as her own contradictory statements on the same call confirm. Winston knew, because she said so, that she regarded Dr. B as a source of personal wealth she expected to inherit, that she had him "primed," and that the money she described as his investment was money he was hiding from his wife.

221. Defendants made the representations with the intent that Michaels rely on them: to induce him to make and continue advancing the Loan; to entrust his 6 Bitcoin, 75 Ether and $5,000 to Defendants; to enter into the Crest Capital Agreement and accept a one-third interest in the Venture in place of one-half of its profits; to leave his assets in Defendants' control and refrain from demanding their return or an accounting; to accept each new date for repayment or return; to refrain from borrowing against his own property; to refrain from disclosing his situation to others; and to refrain from suing.

222. Michaels relied on the representations. In reliance on the Astralo representations he advanced $375,000 and, as Defendants repeated them, deferred collection of the Loan. In reliance on the trading representations he transferred 6 Bitcoin and 75 Ether to Defendants in September 2022 and $5,000 in April 2023. In reliance on the Venture-status and licensing representations he entered into the Crest Capital Agreement, surrendered one-half of the Venture's profits, and left his capital in Defendants' control while the Venture was purportedly organized, licensed and funded. In reliance on the Dr. B and funding representations he deferred collection of the Loan,

accepted each new date, declined to borrow against his own building, and incurred debt in expectation of the promised return. In reliance on the asset-location and present-ability representations and Defendants' December 14, 2025 commitment, he refrained from commencing litigation, from seeking provisional remedies, and from taking any other step to recover his assets before December 25, 2025.

223. Michaels's reliance was reasonable. Defendants were his closest friends of nearly twenty years, who called him family, and who cultivated his trust deliberately, including by exploiting what he had confided to them about his childhood (¶¶ 122–126). From September 2022 they were his partners and fiduciaries in the Venture. They had exclusive possession of the assets and exclusive access to every account, document and counterparty. Their representations were accompanied by part performance in the form of distributions and by repeated written commitments. And Michaels had no practical means of verifying their statements.

224. As a direct and proximate result of Defendants' misrepresentations, Michaels has been damaged in an amount to be proven at trial, including the unpaid principal of and interest on the Loan; the loss of his 6 Bitcoin and 75 Ether and of their appreciation in value; the loss of his $5,000; the value of the one-half profit interest he surrendered under the Crest Capital Agreement; the loss of the profits and other sums Defendants represented had been earned for his account; the loss of the opportunity to recover his assets while they could still be recovered, before accounts holding them were frozen and before Defendants placed them beyond his reach; and consequential damages, including interest on borrowings, and penalties and interest on deferred tax obligations, incurred because his capital was unavailable to him and because he expected to pay those obligations from the sums Defendants promised. Because Defendants were Michaels's fiduciaries when they made the representations alleged in subparagraphs (c) through (f) of paragraph 218, and in subparagraph (b) to the extent they were made after September 2022, Michaels is entitled to recover under Civil Code section 3333 the full amount of the detriment proximately caused by those representations, including the benefit of the

bargain they induced him to accept.

225. This cause of action is timely. Under Code of Civil Procedure section 338, subdivision (d), it did not accrue until Michaels discovered the facts constituting the fraud. Michaels did not discover, and in the exercise of reasonable diligence could not have discovered, those facts until December 17 and December 24, 2025, for the reasons alleged in paragraphs 170 through 176: Defendants held exclusive control of the assets and accounts; they responded to each of Michaels's requests for information with fresh assurances rather than facts; they paid distributions and made written commitments consistent with the truth of their representations; and, as Michaels's partners and fiduciaries, they were persons on whose statements he was entitled to rely without independent investigation.

226. Defendants' conduct was intentional and was undertaken with the intent to deceive and defraud Michaels, and constitutes fraud, oppression and malice within the meaning of Civil Code section 3294, entitling Michaels to an award of punitive and exemplary damages in an amount sufficient to punish Defendants and to deter similar conduct. Defendants' use of what Michaels had confided to them about his own childhood as an instrument of that deception (¶¶ 122–126) was despicable conduct, carried on with a willful and conscious disregard of his rights.

## SIXTH CAUSE OF ACTION

**(Fraud—False Promise, Civil Code §§ 1709, 1710(4), Including Fraudulent Inducement of Forbearance)**

**(Against Crockett, Winston, and Does 1 through 20)**

227. Michaels realleges and incorporates by reference paragraphs 1 through 177 above.

228. This cause of action rests principally on a series of promises Defendants made to Michaels in 2025. The principal promises were that a specific sum would be paid to Michaels on a specific date. Each was made after Michaels had stated in writing that he was out of time and would pursue his rights, and each was made to stop him from

doing so. And each was made without any intention of performing it.

The 2025 Forbearance Promises

229. Between April 9 and December 19, 2025, Defendants made the following promises to Michaels, each alleged with particularity—by speaker, date and medium—in the paragraphs cited:

(a) on April 9, 2025, after Michaels wrote that he was "OUT OF TIME," Crockett promised, by text message, that Defendants "will scale out of our positions and will pay you back all debts / investments plus interest as soon as possible"; when Michaels replied that if Defendants were "becoming my business adversary" the parties needed "a very different conversation about the terms of that return of capital," Crockett promised that Defendants could "scale out of our long term positions and pay you back everything plus interest and additional profit"; and Winston promised that "if you need capital back ahead of that we can definitely scale out of positions and do what makes sense" (¶¶ 65, 113, 130);

(b) on or about June 14, 2025, at a lunch in Los Angeles, Defendants promised that Michaels would be paid $2 million as his share of the Venture's profits, together with the return of his 6 Bitcoin and 75 Ether (¶ 117);

(c) in or around August 2025, and in any event before September 19, 2025, Defendants promised that Michaels would receive, in addition, a bonus of $850,000 from Dr. B, in recognition of the years he had waited and in exchange for his continued forbearance (¶ 128);

(d) on September 19, 2025, after Michaels had written that "The three of us need to have a serious conversation about our partnership," that he was "not treated like a real partner," and that he "really need[ed] an update on money issues," and after he disclosed that he had taken out a margin loan, that he owed six years of back taxes, and that he was "on the phone with Umhofer," Crockett promised, by text message: "Your money with the extra bonus will

hit my account on 10/3" (¶¶ 131–132);

(e) on October 1, 2025, Winston promised, by text message, that Defendants were "on track for the 4th" (¶ 133);

(f) on October 21, 2025, when Michaels asked "what day did you say I'd be able to get my $ out?" Winston promised, by text message: "24th!" (¶ 134);

(g) on October 31, November 3 and November 4, 2025, Winston promised, by text message, that once Dr. B's $500,000 cleared "we can start the process early next week" and "i'll start sending out CB too"; that she was "gonna send the crypto out as soon as we get home!"; and that the transfer of Michaels's capital "with the additional 800k" would take place with Dr. B on Sunday morning, November 9, 2025 (¶¶ 138–140);

(h) on November 8, 2025, Winston promised, by text message, that Michaels's capital would be transferred to him at a meeting with Dr. B at the Sunset Tower Hotel at 2:15 p.m. on November 9, 2025 (¶ 141);

(i) on November 20, 2025, when Michaels asked Defendants to repurchase his Bitcoin and Ether and asked when he would receive them, Winston promised, by text message, that Defendants had "started DCA-ing in" and had "the plan of completing all the purchases and getting you everything on Sunday," November 23, 2025 (¶ 142);

(j) on December 14, 2025, after Michaels wrote that he would "prepare to pursue my rights through other means if I don't get immediate action," demanded that Defendants "commit to Thursday the 25th to return everything that is due to me, approximately $2.8M, in USDC and the Btc and eth amounts discussed (6btc and 75eth)," and asked, "So I can count on that 100%? . . . If not we are decidedly in litigation," Winston promised, by text message, on her own behalf and Crockett's: "we agreed on the 25th," "absolutely," and "i give you a date and my word" (¶¶ 145–150); and

(k) on December 17 and 18, 2025, in recorded telephone calls, Crockett

promised that "you will have your money on the 25th," that Michaels would have "all account statements prior to receiving your money on the 23rd or fourth," and "25th with 33 screenshots on the 24th"; Winston promised to send account statements "today"; and on December 19, 2025, when Michaels supplied the wallet addresses to which his assets were to be returned, Crockett replied, "Confirmed. Thank you" (¶¶ 150, 155, 159–160, 163).

230. These were not forecasts of how an investment might perform, and Defendants did not present them as such. Each date Defendants gave was an unconditional statement that a specific sum—his $2 million share of profits and his $850,000 bonus, approximately $2.85 million in all—would be paid to him, together with the return of his 6 Bitcoin and 75 Ether, on a particular day.

231. The promises coincided not with any event in the Venture's business but with Michaels's threats to act. In the three months between September 19 and December 14, 2025 alone, Defendants gave Michaels six dates for payment. The first came within fifteen minutes of Michaels's statement that he was "on the phone with Umhofer," and the last within hours of his statement that "we are decidedly in litigation"; and all of them followed Michaels's disclosures of mounting financial pressure—"a mountain of debt," a margin loan, six years of back taxes—that made him more likely to act and less able to wait.

<u>The Earlier Promises</u>

232. Defendants also made the following earlier promises to Michaels:

(a) Promises to repay the Loan, including that Crockett would provide "a timeline next week"; that repayment would occur "as soon as our funding closes," which "could be any day in the next week or two"; "before 1/15" and "before 1/7"; "by the end of spring or early summer" from Defendants' share of trading profits; "in a month or two" or "by the summer," together with Crockett's offer to "sign a demand note or other loan document"; that

Winston would "figure out a repayment plan for the loan"; "by the middle/end of December" 2021; and "by EOY" 2021 (¶¶ 54–56, 58–62);

(b) Promises concerning the Venture, including that its profits would be applied first to return Michaels's 6 Bitcoin and 75 Ether and second to repay the Loan with interest, and that Defendants would keep Michaels informed of its positions and results; that Crockett would send Michaels "$10K every month" and "5K on the first and on the 15th of every month like payroll"; that Michaels would receive "a first payment on Monday 10/2" 2023; that Crockett would "send you another disbursement before the end of the month"; and that, if Michaels needed his capital back, Defendants could "scale out of positions" and return it (¶¶ 73, 87–88, 95, 102, 113); and

(c) Promises concerning Crest Capital, including that Defendants would incorporate the Venture within weeks and were "starting docs next week"; that they would register it as an investment adviser, open a bank account for it, and document Michaels's one-third interest; and that Michaels's interest would be preserved through a subsidiary of the RIA (¶¶ 99, 101, 106, 108, 110–111).

<u>Defendants Did Not Intend to Perform</u>

233. When Defendants made each of the promises alleged above, they did not intend to perform it. Michaels alleges Defendants' intent on the basis of the following facts, among others:

(a) Over six years Defendants gave Michaels at least fourteen specific dates for repayment of the Loan or the return of his capital and did not meet one of them; each missed date was followed by a new explanation and a new date.

(b) The 2025 promises were made in response to threats, not events. The dates Defendants gave bore no relation to any funding, trade, approval or other occurrence in the Venture's business, and the first and last of them were given within minutes and hours, respectively, of written threats by Michaels

to act. A promise whose timing is dictated by the promisee's threat rather than by the promisor's ability to perform is a promise made to secure forbearance, not to be kept.

(c) When Defendants made the 2025 promises they lacked the means to perform and knew it. On October 27, 2025, Winston had "$1200 in my bank account." In December 2025 Defendants were "four months behind" on their rent, accounts holding Michaels's assets had been "frozen for weeks," and Crockett could not log in to the accounts. Defendants disclosed none of these facts when they promised performance.

(d) The sums Defendants promised—$2 million in profits and an $850,000 bonus—had no documented basis. Defendants had never provided Michaels an account statement, ledger or trade record from which any profit could be computed, and by their own account on December 17 and 18, 2025 the Venture's assets were spread across 33 accounts whose contents Crockett could not ascertain. Defendants promised to pay a sum they had never calculated from assets they could not locate.

(e) Three days after Winston gave "my word" on December 14, 2025, she could not say where Michaels's assets were, giving five inconsistent answers in a single call, and Crockett could not produce a single account statement.

(f) Defendants never took the steps that performance would have required: no entity was organized, no bank account was shown, no account statement was ever produced, no repurchase of Michaels's Bitcoin and Ether was demonstrated, and no transfer was made to the wallet addresses Michaels supplied on December 19, 2025 and Crockett "Confirmed."

(g) Each promise was accompanied by an excuse for delay that Michaels could not verify and that placed the cause outside Defendants' control—pending financing, an examination, regulatory approval, Dr. B's schedule and

sensitivities, bank processing, a Federal Reserve meeting—while Defendants coached Michaels on what to tell his family and dissuaded him from borrowing against his own property. It was the same technique Defendants had used in 2019, when Uncle Tim's "work emergency" explained why the yacht trip could not proceed.

(h) On the morning of the meeting at which Michaels's capital was to be transferred, Defendants asked him to calculate his back taxes, "the higher the better." On information and belief, Defendants sought that figure not to pay it but to gauge how much Michaels needed and how long he could be held off.

(i) On December 24, 2025, Crockett acknowledged in writing that Defendants would neither account nor pay, and Defendants then ceased all communication with Michaels and ignored a formal demand.

<u>Intent to Induce Forbearance</u>

234. Defendants made each promise in direct response to a request by Michaels for repayment, for the return of his capital, for information, or for a date certain, and with the intent that Michaels rely on it by continuing to wait, leaving his assets in Defendants' control, forgoing other remedies and refraining from filing suit. Defendants knew what Michaels would otherwise do, because he told them: on April 9, 2025, that if they were "becoming my business adversary" the parties needed "a very different conversation about the terms of that return of capital"; on December 14, 2025, that he would "pursue my rights through other means" and that "we are decidedly in litigation." Defendants understood the promises as the price of his forbearance: Winston stated on December 17, 2025 that if the date passed unmet she would "support you in moving forward with litigation," and Crockett stated that he would "welcome a lawsuit on the 25th if you don't get your money back" and that "if not the 25th then I will be expecting litigation." And on November 4, 2025, Defendants secured Michaels's agreement to wait for a Sunday meeting that never took place by telling him that Dr. B, who had suffered

abuse as a child as Michaels had, wanted to hold his hand when his capital was returned (¶ 125).

Reliance

235. Michaels relied on the promises, and his reliance was reasonable for the reasons alleged in paragraph 223. His reliance was specific, and it was the reliance Defendants intended. Michaels had told Defendants in writing precisely what he would do if he was not paid, and, in reliance on each promise, he did not do it. In particular, in reliance on the 2025 forbearance promises, Michaels did not commence litigation against Defendants; did not seek a writ of attachment, a temporary restraining order or any other provisional remedy to freeze the accounts in which his assets were held while those accounts could still be identified and reached; did not authorize counsel to commence litigation until after December 25, 2025; did not demand or obtain the account information and exchange records that would have permitted him to trace his assets; declined, at Defendants' urging, to borrow against his own building; did not disclose his situation to his family or others who might have assisted him; and continued to defer payment of taxes and other obligations that he expected to pay from the promised sums, incurring penalties and interest on them. In reliance on the earlier promises he deferred collection of the Loan for years and left his 6 Bitcoin, 75 Ether and $5,000 in Defendants' control.

236. Had Defendants told Michaels the truth on any of the dates alleged in paragraph 229—that they had no basis for the $2 million figure, no bonus, no funding, no entity, no registration, no bank account, no means of paying him, and no intention of paying him on the date given—Michaels would have commenced litigation and sought provisional remedies immediately, at a time when, by Defendants' own later account, at least some of the accounts holding his assets had not yet been frozen.

Non-Performance and Damages

237. Defendants did not perform any of the promises. They have repaid no part of the Loan; have returned none of Michaels's Bitcoin, Ether or funds; have paid no part

of the $2 million or the $850,000; have produced no account statement; and have paid Michaels nothing since November 6, 2023.

238. As a direct and proximate result of Defendants' false promises, Michaels has been damaged in an amount to be proven at trial, including the losses alleged in paragraph 224; the loss of the opportunity to recover his assets, or a greater portion of them, before accounts holding them were frozen and before Defendants placed them beyond his reach; the interest Michaels paid on his margin loan and other borrowings during the period of his forbearance; the penalties and interest he incurred on tax and other obligations he deferred in expectation of the promised payments; and the appreciation in value of the 6 Bitcoin and 75 Ether that Defendants promised to return and did not.

239. Because Defendants were Michaels's partners and fiduciaries when they made the 2025 forbearance promises, Michaels is further entitled to recover under Civil Code section 3333 the full amount of the detriment proximately caused by them, including the benefit of the bargain Defendants induced him to accept: the $2 million share of profits and the $850,000 bonus that Defendants promised him in exchange for his forbearance and never paid. Michaels seeks that recovery in the alternative to his recovery of the same sums under the Tenth Cause of Action.

240. Defendants' conduct was intentional and was undertaken with the intent to deceive and defraud Michaels, and constitutes fraud, oppression and malice within the meaning of Civil Code section 3294, entitling Michaels to an award of punitive and exemplary damages. Defendants' use of what Michaels had confided to them about his own childhood as an instrument of that deception (¶¶ 122–126) was despicable conduct, carried on with a willful and conscious disregard of his rights.

## SEVENTH CAUSE OF ACTION

**(Fraud—Concealment, Civil Code §§ 1709, 1710(3))**

**(Against Crockett, Winston, and Does 1 through 20)**

241. Michaels realleges and incorporates by reference paragraphs 1 through 177

above.

242. From September 2022 forward, Michaels, Crockett and Winston were partners in the Venture: they associated to carry on as co-owners a business for profit, Michaels contributed capital to it, Defendants managed it, its profits were to be shared among them, and under the Crest Capital Agreement Michaels became the owner of one-third of it (¶¶ 73, 79–80, 105–106). As Michaels's partners, Defendants owed him fiduciary duties of loyalty, care and candor, including the duty to disclose fully and truthfully all information concerning the Venture's business and the assets Michaels had entrusted to them.

243. Independently of the partnership, Defendants had a duty to disclose the facts alleged below because they had exclusive knowledge of those facts, which were not known or reasonably accessible to Michaels; because Defendants actively concealed them; and because Defendants made partial representations to Michaels about the Venture's structure, licensing and funding and about the location, status and imminent return of his assets while suppressing the facts that made those representations misleading.

244. Defendants intentionally concealed from and failed to disclose to Michaels the following material facts:

(a) that the assets Michaels had entrusted to Defendants, and their proceeds, were held in 33 separate accounts on Bybit, an exchange that does not permit United States customers;

(b) that those accounts were non-KYC accounts that Defendants accessed through a VPN that made their access appear to originate outside the United States, in order to evade the exchange's restrictions;

(c) that accounts holding Michaels's assets had been frozen by the exchange, in some instances for weeks;

(d) that the transfers to Coinbase that Winston had described to Michaels during 2025 as movements of his capital were not of his funds;

(e) that funds Defendants represented to be Michaels's were held in a Coinbase Pro account bearing the name of Dr. B, and were commingled with funds Defendants attributed to Dr. B and with Defendants' own funds;

(f) that, as Michaels is informed and believes, no corporation, limited liability company or other entity had been formed for the Venture, no application for registration as an investment adviser had been submitted or approved, Crockett had not become a licensed investment adviser, and no bank account had been opened for the Venture—facts that Defendants alone were in a position to know, that Michaels could not verify because no filing, receipt or engagement existed to be found, and that Defendants concealed by telling Michaels for more than a year that the RIA application was pending and "could get approved anytime";

(g) that Defendants had no documented basis for the $2 million they told Michaels was his share of the Venture's profits or for the $850,000 bonus, had never computed either figure from any account statement or ledger, and had no commitment from Dr. B to pay any bonus;

(h) that, as Michaels is informed and believes, the $7 million check Winston displayed to Michaels was never deposited to any account for the benefit of the Venture, and Dr. B had not invested the sums represented;

(i) that Defendants were months behind on their rent, had "$1200" in the bank, depended on the Venture's assets for their own living expenses, and lacked the means to return Michaels's assets or pay the sums they had promised;

(j) that Defendants had received from the Venture's investor, by their own account, a check payable to Crockett personally, an automobile, handbags and other gifts and benefits, which they treated as their own and did not account for to the partnership or share with Michaels;

(k) that Defendants intended to "cut ties" with Dr. B, the investor whose funding they had represented as the basis for the Venture and for Michaels's

$2 million return; and

(l) that Defendants could not, and did not intend to, return Michaels's assets or pay the sums they had promised on the dates they gave him.

245. Defendants knew these facts at all times after each fact arose, including when they made the representations and promises alleged in paragraphs 73 through 177, and knew that Michaels did not know them.

246. Defendants concealed these facts with the intent to induce Michaels to enter into the Crest Capital Agreement, to leave his assets in their control, to refrain from demanding their return, to refrain from commencing litigation or seeking provisional remedies, to refrain from disclosing the matter to others, and to refrain from borrowing elsewhere, and Michaels did each of those things in reliance on Defendants' silence and partial disclosures.

247. Michaels was unaware of the concealed facts (¶¶ 109, 161). Had he known them, he would not have entered into the Crest Capital Agreement, would have demanded the immediate return of his assets, would have refused to accept further promised dates, and would have taken legal action to recover his assets and the amounts owed to him years earlier.

248. Michaels reasonably relied on Defendants, who were his partners, fiduciaries and friends of many years, and whose statements were accompanied by part performance in the form of distributions and by repeated written commitments.

249. As a direct and proximate result of Defendants' concealment, Michaels has been damaged in an amount to be proven at trial, including the losses alleged in paragraphs 224 and 238.

250. This cause of action is timely for the reasons alleged in paragraph 225.

251. Defendants' conduct was intentional and was undertaken with the intent to deceive and defraud Michaels, and constitutes fraud, oppression and malice within the meaning of Civil Code section 3294, entitling Michaels to an award of punitive and exemplary damages.

## EIGHTH CAUSE OF ACTION

**(Negligent Misrepresentation, Civil Code §§ 1709, 1710(2))**

**(Against Crockett, Winston, and Does 1 through 20)**

252. Michaels realleges and incorporates by reference paragraphs 1 through 177 above.

253. This cause of action is pleaded in the alternative to the Fifth Cause of Action, in the event the trier of fact finds that Defendants made the representations alleged below without knowledge of their falsity.

254. Defendants made to Michaels the representations of existing fact alleged in paragraph 218, subparagraphs (a) through (f), each of which is realleged here.

255. Those representations were untrue, as alleged in paragraph 219.

256. Defendants made the representations without any reasonable ground for believing them to be true. Each was a positive assertion concerning Defendants' own company, finances, trading, accounts, filings, licensing or dealings with third parties—matters Defendants were in a position to know and Michaels was not—and Defendants either knew the true facts or asserted matters they had not verified and could readily have verified.

257. Defendants made the representations with the intent that Michaels rely on them, as alleged in paragraph 221.

258. Michaels reasonably relied on the representations, as alleged in paragraphs 222 and 223.

259. As a direct and proximate result, Michaels has been damaged in an amount to be proven at trial, including the losses alleged in paragraph 224.

260. This cause of action is timely for the reasons alleged in paragraph 225 and in paragraphs 170 through 176.

**NINTH CAUSE OF ACTION**

**(Breach of Oral Contract—The Loan)**

**(Against Crockett and Winston)**

261. Michaels realleges and incorporates by reference paragraphs 1 through 177 above.

262. In or about January 2017, Michaels, Crockett and Winston entered into an oral agreement under which Michaels agreed to lend Crockett and Winston up to $375,000, to be advanced in installments as Astralo required, and Crockett and Winston agreed to repay the full amount advanced within a reasonable time (the “Loan Agreement”) (¶¶ 25, 29–30).

263. The Loan Agreement was supported by consideration, including Michaels’s advances of funds and Crockett’s and Winston’s promise to repay them.

264. Michaels performed all of his obligations under the Loan Agreement. Between January 2017 and January 2019 he advanced a total of $375,000 to Crockett and Winston in five installments, all of which they received and used for Astralo.

265. The parties later modified the Loan Agreement in the following respects: (a) Crockett and Winston agreed that the Loan would be repaid with interest; (b) on February 19, 2021, Crockett, on behalf of himself and Winston, agreed that the Loan would be repaid from Defendants’ share of the profits of their cryptocurrency trading; and (c) in or about September 2022, as part of the Trading Partnership Agreement, Michaels, Crockett and Winston agreed that the Venture’s profits would be applied to repayment of the Loan with interest after the return of Michaels’s 6 Bitcoin and 75 Ether.

266. Between November 2019 and December 2025, Crockett and Winston repeatedly acknowledged the Loan in writing and promised in writing to repay it, on the dates and in the words alleged in paragraphs 54 through 65 and 146 through 150. Each such acknowledgment and promise, other than Crockett’s oral statements on the December 18, 2025 call, was contained in an electronic message composed and sent by Crockett or Winston from his or her own messaging account, and each is an

acknowledgment or promise in writing signed by the party to be charged within the meaning of Code of Civil Procedure section 360. In particular, on April 9, 2025, Crockett acknowledged the Loan and promised to repay "all debts / investments plus interest," and on December 14, 2025, Winston, on behalf of both Defendants, agreed to Michaels's demand that Defendants return "everything that is due" to him on December 25, 2025, writing "we agreed on the 25th."

267. Crockett and Winston breached the Loan Agreement by failing to repay any part of the principal or interest within a reasonable time; by failing to repay the Loan by any of the dates they promised; by failing to repay it on December 25, 2025, as they had committed; and by failing to repay it after Michaels's written demands of December 14, 2025 and January 1, 2026.

268. All conditions precedent to Crockett's and Winston's obligation to repay the Loan have occurred or been performed, or have been excused or waived.

269. As a direct and proximate result of the breach, Michaels has been damaged in the amount of $375,000, together with interest at the legal rate of ten percent per annum under Civil Code section 3289, subdivision (b), from the date of breach, in a total amount to be proven at trial.

270. Crockett and Winston are estopped from contending that this cause of action is untimely. Each time Michaels sought repayment, they induced him to forbear by acknowledging the Loan and promising imminent repayment, and Michaels forbore in reliance on those promises. Michaels did not learn that Crockett and Winston would not repay the Loan until December 24, 2025.

## TENTH CAUSE OF ACTION

**(Breach of Contract—Trading Partnership Agreement; Crest Capital Agreement; 2025 Forbearance Agreements; December 14, 2025 Agreement)**

**(Against Crockett and Winston)**

271. Michaels realleges and incorporates by reference paragraphs 1 through 177 above.

The Trading Partnership Agreement

272. In or about September 2022, Michaels, Crockett and Winston entered into the Trading Partnership Agreement alleged in paragraph 73, under which Michaels agreed to contribute 6 Bitcoin and 75 Ether to the Venture as capital, and Crockett and Winston agreed (a) to manage the Venture's trading; (b) to apply the Venture's profits first to the return of Michaels's 6 Bitcoin and 75 Ether, second to repayment of the Loan with interest, and thereafter to distribution among the partners; and (c) to keep Michaels informed of the Venture's positions and results.

273. Crockett and Winston also agreed that Michaels's capital would be returned to him upon his request, as Winston confirmed in writing on April 9, 2025, and repeatedly committed to specific dates for its return.

274. The Trading Partnership Agreement was supported by consideration, including Michaels's contribution of his 6 Bitcoin and 75 Ether, his later contribution of $5,000, and his agreement to defer repayment of the Loan until the Venture generated profits.

275. Michaels performed all of his obligations under the Trading Partnership Agreement. He transferred 6 Bitcoin to Defendants on September 26, 2022 and 75 Ether on September 27, 2022, contributed $5,000 on April 20, 2023, and deferred collection of the Loan as agreed.

276. Crockett and Winston breached the Trading Partnership Agreement by, among other things, failing to return Michaels's 6 Bitcoin and 75 Ether from the Venture's profits or otherwise, despite his repeated requests and their repeated representations that the Venture was profitable; failing to apply any profits to repayment of the Loan; failing to return Michaels's capital upon his request; failing to keep Michaels informed of the Venture's positions, results and assets; and refusing to provide any account statement or accounting.

The Crest Capital Agreement

277. In or about November 2024, Michaels, Crockett and Winston entered into

the Crest Capital Agreement alleged in paragraphs 105 through 108, under which the Venture, and its profits and other benefits after the return of Michaels's capital and repayment of the Loan, would be owned in equal one-third shares; Michaels's 6 Bitcoin and 75 Ether would remain in the Venture as his capital; and Crockett and Winston agreed to organize the Venture as a legal entity, to register it as an investment adviser, to open a bank account to receive Dr. B's funds, to document Michaels's one-third interest, and to preserve that interest through a subsidiary of the RIA.

278. The Crest Capital Agreement was supported by consideration, including Michaels's surrender of his right to one-half of the Venture's profits, his agreement to leave his capital in Defendants' control while the Venture was organized and funded, and his continued deferral of repayment of the Loan.

279. Michaels performed all of his obligations under the Crest Capital Agreement. He left his capital in the Venture, deferred collection of the Loan, and did not demand the return of his assets while Defendants represented that the Venture's organization, registration and funding were in progress.

280. Crockett and Winston breached the Crest Capital Agreement by failing to organize the Venture as a legal entity, to register it as an investment adviser, to open a bank account for it, or to document Michaels's one-third interest; by failing to pay Michaels any share of the profits and other benefits of the Venture, including one-third of the benefits they received from Dr. B, while by their own account receiving a $7 million check, an automobile, handbags and other benefits from him; by excluding Michaels from the Venture's dealings with its investor; and by deciding unilaterally to "cut ties" with that investor.

<u>The 2025 Forbearance Agreements</u>

281. On each of September 19, October 1, October 21, November 4, November 8 and November 20, 2025, in response to Michaels's requests for payment or for a date certain, and after Michaels had stated in writing that he would otherwise act to recover what was owed to him, Crockett or Winston, on behalf of both Defendants, promised in

writing that Michaels's 6 Bitcoin and 75 Ether, his $2 million share of profits and his $850,000 bonus would be paid to him on a stated date—October 3, October 4, October 24, November 9 (promised on both November 4 and November 8) and November 23, 2025—in exchange for Michaels's forbearance from litigation and other collection efforts until that date (collectively, the "2025 Forbearance Agreements") (¶¶ 132–134, 138–142).

282. Michaels accepted each such promise by forbearing, as Defendants requested and intended. Michaels's forbearance from asserting his claims, which he was entitled to assert and had told Defendants he would assert, constituted consideration for each of the 2025 Forbearance Agreements.

283. Michaels performed all of his obligations under the 2025 Forbearance Agreements. He commenced no litigation and took no other action to recover his assets before any of the stated dates.

284. Crockett and Winston breached each of the 2025 Forbearance Agreements by failing to pay Michaels any sum, or to return any of his assets, on the stated date or at any time thereafter.

The December 14, 2025 Agreement

285. On December 14, 2025, Michaels, Crockett and Winston entered into the December 14 Agreement, memorialized in the written messages alleged in paragraphs 145 through 150. Under the December 14 Agreement, Crockett and Winston agreed to return to Michaels, on December 25, 2025, his 6 Bitcoin and 75 Ether and approximately $2.85 million in USDC, consisting of his $2 million share of profits and his $850,000 bonus, and, as Crockett confirmed on December 18, 2025, to deliver account statements for all accounts holding Michaels's assets on or before December 24, 2025.

286. In exchange, Michaels agreed to accept December 25, 2025 as the date of performance in place of immediate performance, to forgo the alternative Defendants had proposed of a later payment in January 2026, and to refrain from commencing litigation or pursuing any other remedy before December 25, 2025.

287. Michaels's forbearance from litigation and from other collection efforts constituted consideration for the December 14 Agreement. Crockett and Winston understood and intended that Michaels would so forbear: Michaels told Winston that if she could not commit to the date "we are decidedly in litigation"; Winston stated on December 17, 2025 that if the date passed unmet she would "support you in moving forward with litigation"; and Crockett stated that he would "welcome a lawsuit on the 25th if you don't get your money back" and that "if not the 25th then I will be expecting litigation."

288. Winston entered into the December 14 Agreement on her own behalf and as Crockett's authorized agent, as her messages reflected. Crockett ratified and confirmed the December 14 Agreement on December 18, 2025 and on December 19, 2025.

289. Michaels performed all of his obligations under the December 14 Agreement. He refrained from commencing litigation and from any other collection effort before December 25, 2025, and on December 19, 2025 he provided Defendants with the wallet addresses to which his assets were to be returned.

290. All conditions precedent to Crockett's and Winston's performance under the Trading Partnership Agreement, the Crest Capital Agreement, the 2025 Forbearance Agreements and the December 14 Agreement have occurred or been performed, or have been excused or waived.

291. Crockett and Winston breached the December 14 Agreement by failing to deliver any account statement on or before December 24, 2025, and by failing to return Michaels's 6 Bitcoin and 75 Ether or to pay any part of the approximately $2.85 million on December 25, 2025 or at any time thereafter. Crockett acknowledged the breach in writing on December 24, 2025.

<u>Damages and Specific Performance</u>

292. As a direct and proximate result of these breaches, Michaels has been damaged in an amount to be proven at trial, including the value of 6 Bitcoin and 75 Ether

as of the date of breach or such later date as the Court determines to be appropriate; the approximately $2.85 million that Crockett and Winston agreed to pay under the 2025 Forbearance Agreements and the December 14 Agreement; the value of Michaels's one-third share of the profits and other benefits of the Venture under the Crest Capital Agreement; interest on those amounts at the legal rate from the date of breach; and consequential damages.

293. Michaels is further entitled to specific performance of Crockett's and Winston's obligation to return his 6 Bitcoin and 75 Ether to the wallet addresses he provided, in that the assets are unique and identifiable digital assets whose value fluctuates and for which an award of damages may be an inadequate remedy.

## ELEVENTH CAUSE OF ACTION

**(Breach of Fiduciary Duty)**

**(Against Crockett and Winston)**

294. Michaels realleges and incorporates by reference paragraphs 1 through 177 above.

295. From September 2022 forward, Michaels, Crockett and Winston associated to carry on, as co-owners, a business for profit—the Venture—to which Michaels contributed capital, which Crockett and Winston managed, and whose profits were to be shared among the three of them (¶¶ 73, 79–80, 105–106). Their association constituted a partnership under Corporations Code section 16202, subdivision (a), whether or not they intended to form a partnership, and each of them referred to the others as partners.

296. As Michaels's partners, Crockett and Winston owed him the fiduciary duties of loyalty and care set forth in Corporations Code section 16404, including the duties to account to the partnership and hold as trustee for it any property, profit or benefit derived in the conduct of its business or from the use of its property; to refrain from dealing with the partnership as or on behalf of a party having an interest adverse to it; to refrain from grossly negligent or reckless conduct, intentional misconduct and knowing violations of law; and to discharge their duties consistently with the obligation

of good faith and fair dealing. They also owed Michaels the duties, under Corporations Code section 16403, subdivision (c), to furnish to him without demand any information concerning the Venture's business and affairs reasonably required for the exercise of his rights, and on demand any other information concerning the Venture's business and affairs.

297. Independently of the partnership, Crockett and Winston owed Michaels fiduciary duties because Michaels entrusted his 6 Bitcoin, 75 Ether and $5,000 to them to hold, manage and trade on his behalf, with exclusive control over the assets and over every account in which they were held, and because Crockett and Winston held themselves out as, and Michaels reposed trust and confidence in them as, persons acting for his benefit in the management of his property.

298. Crockett and Winston breached their fiduciary duties to Michaels by, among other things:

(a) failing and refusing to furnish Michaels with account statements, ledgers, trade records or any other information concerning the Venture's assets and results, despite his repeated requests;

(b) holding the Venture's assets, including Michaels's capital and its proceeds, in 33 non-KYC accounts on an offshore exchange that does not permit United States customers, accessed through a foreign VPN, thereby exposing those assets to freezing and forfeiture and causing some of them to be frozen;

(c) commingling Michaels's capital and its proceeds with funds attributed to Dr. B and with their own funds, and holding funds represented to be Michaels's in an account bearing Dr. B's name;

(d) routing funds intended for the Venture through Winston's personal account and accepting, in Crockett's personal name, a check represented to be Dr. B's investment in the Venture;

(e) operating the Venture while insolvent and dependent on its trading for their

own living expenses, and, as Michaels is informed and believes, using the Venture's assets, including Michaels's capital, to fund their own living expenses—conduct Winston did not deny when Michaels wrote to her on August 25, 2024 that "using my money to fund your lives" appeared "totally acceptable to you";

(f) appropriating to themselves, and failing to account to the partnership or to Michaels for, the property, profits and benefits derived from the conduct of the Venture's business and from the use of its property, including, by their own account, a $7 million check from the Venture's investor made payable to Crockett personally, a Lincoln Aviator, luxury handbags, a shooting-range membership, the use of Dr. B's credit card and other gifts and benefits from that investor, in violation of Corporations Code section 16404, subdivision (b)(1);

(g) excluding Michaels from the Venture's relationship with its investor: never permitting him to meet or communicate with Dr. B, meeting and dining with Dr. B and his family without Michaels, cultivating a personal relationship with Dr. B from which Winston expected to inherit his wealth, negotiating the terms and amount of Dr. B's investment without consulting Michaels, and, on information and belief, failing to disclose Michaels's one-third interest to Dr. B or to document it in any instrument relating to Dr. B's investment;

(h) making no distribution to Michaels after November 6, 2023, while representing that the Venture was profitable and while, by their own account, receiving millions of dollars in investment and substantial gifts from the Venture's investor;

(i) making unilateral decisions concerning the Venture's business, including the decision to "cut ties with Dr. B," without consulting Michaels;

(j) failing to organize the Venture as a legal entity, to register it as an

investment adviser, to open a bank account for it, or to document Michaels's one-third interest, as they had undertaken to do, while representing to Michaels that each of those steps was complete or imminent, and structuring the Venture, by their own description, so that Crockett alone would own the RIA and Michaels's "name is not on anything";

(k) misrepresenting to Michaels, and concealing from him, the material facts alleged in paragraphs 218, 219 and 244;

(l) failing to return Michaels's capital from the Venture's profits or otherwise as agreed, while representing that the Venture was profitable; and

(m) preferring their own interests to Michaels's, including by dissuading him from protecting himself by other means, by coaching him on what to tell others about the Venture, by inducing his forbearance with promises they did not intend to keep, and by exploiting what he had confided to them about his childhood to secure that forbearance (¶¶ 122–126).

299. Crockett and Winston took the benefits of the partnership for themselves and denied them to Michaels. By their own account, the Venture's investor paid them $7 million and gave them an automobile, handbags, the use of his credit card and other gifts, and Winston expected to become his heir; Michaels, their partner and by their agreement a one-third owner of the Venture, received no distribution after November 2023, no account statement at any time, no share of any benefit received from the investor, no meeting with the investor, and no document evidencing his interest.

300. As a direct and proximate result of these breaches, Michaels has been damaged in an amount to be proven at trial, including the loss of his 6 Bitcoin and 75 Ether and their appreciation in value; the loss of his $5,000; the loss of the Loan principal and interest that the Venture's profits were to have repaid; the loss of the profits and returns that Crockett and Winston represented the Venture had earned for his account; one-third of the value of the property, profits and benefits Crockett and Winston derived from the Venture's business and appropriated to themselves; and consequential

damages.

301. By reason of their breaches, Crockett and Winston hold Michaels's 6 Bitcoin and 75 Ether, their proceeds, and all property traceable to them, together with one-third of the property, profits and benefits they derived from the Venture's business and appropriated to themselves, as involuntary trustees for Michaels's benefit under Civil Code sections 2223 and 2224 and Corporations Code section 16404, subdivision (b)(1), and Michaels is entitled to the imposition of a constructive trust over those assets wherever held, including in the accounts described in paragraphs 153 and 157.

302. Crockett's and Winston's breaches were intentional and were committed with fraud, oppression and malice within the meaning of Civil Code section 3294, entitling Michaels to an award of punitive and exemplary damages.

**TWELFTH CAUSE OF ACTION**

**(Accounting)**

**(Against Crockett and Winston)**

303. Michaels realleges and incorporates by reference paragraphs 1 through 177 above.

304. Crockett and Winston are Michaels's partners in the Venture and his fiduciaries, as alleged in paragraphs 295 through 297, and are persons to whom Michaels entrusted his 6 Bitcoin, 75 Ether and $5,000 to hold and trade for his benefit.

305. Michaels is entitled, under Corporations Code section 16405, subdivision (b), and under the equitable powers of the Court, to an accounting of the Venture's business and of all property he entrusted to Crockett and Winston.

306. The amount due to Michaels cannot be ascertained without an accounting. Crockett and Winston have held the Venture's assets in 33 separate accounts and in derivative positions whose value fluctuates continuously; have commingled Michaels's capital with funds attributed to Dr. B and with their own; have made distributions in amounts that are not fully documented; have received, by their own account, investment funds and gifts from the Venture's investor whose amount and disposition are known

only to them; have never provided a statement, ledger or trade record; and have themselves stated that it was "impossible to know exactly how many we have at any given moment" and that Crockett could not "log in to 33 accounts" to produce a statement.

307. Michaels demanded an accounting from Crockett and Winston, including on December 14, 2025 and, through counsel, on January 1, 2026. Crockett and Winston promised statements on December 17, 18, 23 and 24, 2025, but have refused and failed to account.

308. Michaels is entitled to an order requiring Crockett and Winston to render a full and complete accounting of all funds and digital assets received from Michaels; all trading conducted with them; all accounts, wallets and positions in which they or their proceeds have been held; all transfers among those accounts and to or from any third party, including Dr. B; all funds, property and benefits received from Dr. B or any other investor in or on account of the Venture, and their disposition; all distributions made to any partner; and all assets and liabilities of the Venture; and to pay Michaels the amounts found due.

## THIRTEENTH CAUSE OF ACTION

**(Conversion)**

**(Against Crockett, Winston, and Does 1 through 20)**

309. Michaels realleges and incorporates by reference paragraphs 1 through 177 above.

310. Michaels owned and had the right to possess 6 Bitcoin and 75 Ether, which he transferred on September 26 and 27, 2022 to the deposit addresses Crockett had designated, and $5,000, which he transferred to Crockett's bank account on April 20, 2023 for the specific purpose of funding a futures-trading account. Defendants received those assets subject to Michaels's right to their return: the 6 Bitcoin and 75 Ether were to be returned to him in kind before any other application of the Venture's profits (¶ 73), and Defendants repeatedly acknowledged his right to their return.

311. Michaels demanded the return of his 6 Bitcoin and 75 Ether on December 14, 2025. On December 19, 2025, at Defendants' request, he designated the wallet addresses to which they were to be returned, and Crockett replied, "Confirmed." Michaels demanded their return again, through counsel, on January 1, 2026.

312. Defendants have wrongfully exercised dominion over Michaels's property, in a manner inconsistent with his rights, by refusing and failing to return it after demand; by transferring it among 33 undisclosed accounts and, on information and belief, into an account bearing Dr. B's name; by commingling it with funds attributed to Dr. B and with their own funds; and by placing it in non-KYC accounts on an offshore exchange, where some of it has been frozen.

313. To the extent Defendants contend that Michaels's 6 Bitcoin and 75 Ether became property of the Venture upon their transfer, Michaels's right to their immediate possession arose no later than December 25, 2025, under the December 14 Agreement, and Defendants' retention of them after that date is wrongful.

314. Michaels did not consent to Defendants' retention of his property after demand, to its transfer into accounts bearing the names of others, or to its commingling with the funds of others.

315. Michaels is informed and believes that Does 1 through 20 received, hold, or assisted in transferring or concealing Michaels's property with knowledge of his rights in it.

316. As a direct and proximate result of Defendants' conversion, Michaels has been damaged in an amount to be proven at trial. Under Civil Code section 3336, Michaels is entitled to recover the value of the property at the time of conversion, with interest from that time, or, in the alternative, an amount sufficient to indemnify him for the loss that is the natural, reasonable and proximate result of Defendants' wrongful act—which, because Bitcoin and Ether fluctuate in value and Michaels pursued their return with diligence, includes their highest market value between the date of conversion and a reasonable time thereafter—together with fair compensation for the time and

money properly expended in pursuit of the property.

317. Michaels is further entitled to an order for the specific recovery of his 6 Bitcoin and 75 Ether, and of any property into which they have been converted, from any Defendant in whose possession or control they are found. Michaels has no adequate remedy at law for the loss of these assets, whose value fluctuates daily and which Defendants can move between accounts and jurisdictions in minutes. Unless Defendants are restrained, they are likely to transfer, encumber or dissipate the assets: the assets are held in non-KYC accounts on an offshore exchange, accessed through a foreign VPN, and some have already been frozen; Defendants are insolvent; and Defendants have cut off communication with Michaels and ignored his demand.

318. Defendants' conversion was intentional and was committed with fraud, oppression and malice within the meaning of Civil Code section 3294, entitling Michaels to an award of punitive and exemplary damages.

## FOURTEENTH CAUSE OF ACTION

**(Common Counts—Money Lent; Money Had and Received)**

**(Against Crockett and Winston)**

319. Michaels realleges and incorporates by reference paragraphs 1 through 177 above.

320. Crockett and Winston became indebted to Michaels in the sum of $375,000 for money lent by Michaels to Crockett and Winston at their request between January 2017 and January 2019.

321. Crockett and Winston became indebted to Michaels in the sum of $5,000 for money had and received by Crockett and Winston on April 20, 2023, for the use and benefit of Michaels, to be applied to a futures-trading account for the Venture, which sum was not used for Michaels's benefit and has not been returned to him.

322. To the extent Crockett and Winston sold, exchanged or otherwise disposed of Michaels's 6 Bitcoin and 75 Ether, they became indebted to Michaels for the proceeds, which they received and held for Michaels's use and benefit and have not paid to him.

323. Crockett and Winston acknowledged the indebtedness in writing on the dates alleged in paragraphs 54 through 65 and 146 through 150, and Michaels demanded payment on December 14, 2025 and January 1, 2026.

324. No part of these sums has been paid, except that Crockett and Winston paid Michaels the distributions alleged in paragraph 97.

325. There is now due, owing and unpaid from Crockett and Winston to Michaels the sum of $380,000, together with the proceeds described in paragraph 322 and interest at the legal rate from the date each sum became due, in an amount to be proven at trial.

**FIFTEENTH CAUSE OF ACTION**

**(Receipt and Withholding of Stolen Property—Penal Code Section 496)**

**(Against Crockett, Winston, and Does 1 through 20)**

326. Michaels realleges and incorporates by reference paragraphs 1 through 177 above.

327. Penal Code section 496, subdivision (a), prohibits receiving property that has been stolen or obtained in any manner constituting theft, knowing the property to be so stolen or obtained, and prohibits concealing, selling or withholding, or aiding in concealing, selling or withholding, any such property from its owner, knowing the property to be so stolen or obtained. Subdivision (c) of section 496 provides that any person injured by a violation of subdivision (a) may bring an action for three times the amount of actual damages, costs of suit, and reasonable attorney's fees.

328. Under Penal Code section 484, subdivision (a), theft includes knowingly and designedly defrauding another person of money or property by any false or fraudulent representation or pretense, and fraudulently appropriating property that has been entrusted to one.

329. Crockett and Winston obtained Michaels's $375,000, his 6 Bitcoin and 75 Ether, and his $5,000 by the false and fraudulent representations, pretenses and promises alleged in paragraphs 218 through 220 and 229 through 234, knowingly and designedly

and with the specific intent to defraud Michaels of his property. In the alternative, Crockett and Winston, having been entrusted with Michaels's 6 Bitcoin, 75 Ether and $5,000 to hold and trade for his benefit, fraudulently appropriated that property to their own use, including by commingling it with their own funds and with funds attributed to Dr. B, by transferring it among undisclosed accounts and into an account bearing another person's name, by using it, on information and belief, for their own living expenses, and by refusing to return it.

330. Crockett and Winston knew that the property had been so obtained, because they obtained it. They received the property and have concealed and withheld it from Michaels, including by refusing to disclose its location, refusing to provide account statements, and refusing to return it after demand. Michaels is informed and believes that Does 1 through 20 received, concealed or withheld Michaels's property, or aided Crockett and Winston in doing so, knowing that it had been so obtained.

331. Michaels has been injured by Defendants' violations of Penal Code section 496, subdivision (a), in an amount to be proven at trial, including the loss of his $375,000, his 6 Bitcoin and 75 Ether and their value, and his $5,000.

332. Under Penal Code section 496, subdivision (c), Michaels is entitled to recover three times the amount of his actual damages, his costs of suit, and his reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Michaels prays for judgment against Defendants, and each of them, as follows:

1. On the First, Second and Third Causes of Action, for actual damages under Section 28(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a), including rescissory damages measured by the value of the consideration Michaels paid for the securities or, in the alternative, his out-of-pocket loss, in an amount to be proven at trial, together with prejudgment interest;

2. On the Fourth Cause of Action, for rescission of Michaels's purchases of

the securities and restitution of the consideration paid—6 Bitcoin, 75 Ether and $5,000, or their value, together with the value of the profit interest surrendered under the Crest Capital Agreement—with interest at the legal rate from the dates of purchase under Corporations Code section 25501, or, in the alternative, for damages as provided in that section;

3. For compensatory damages in an amount to be proven at trial, including (a) $375,000, together with interest at the agreed rate or, absent an agreed rate, at the rate of ten percent per annum from the date of breach; (b) the value of 6 Bitcoin and 75 Ether measured as provided in Civil Code section 3336 or, in the alternative, their return in kind; (c) the approximately $2.85 million Defendants agreed to pay under the 2025 Forbearance Agreements and the December 14 Agreement, or, in the alternative, the same sums as damages for fraud by a fiduciary under Civil Code section 3333; (d) the value of Michaels's one-third share of the profits and other benefits of the Venture under the Crest Capital Agreement; and (e) consequential damages according to proof, including interest on borrowings and penalties and interest on deferred obligations incurred in reliance on Defendants' promises;

4. For a declaration that Michaels owns a one-third interest in the Venture, by whatever name it is conducted, and in its profits, property and other benefits, and for an order requiring Defendants to account for and pay to Michaels his one-third share;

5. For specific performance of Defendants' obligation to return 6 Bitcoin and 75 Ether to the wallet addresses Michaels designated, and for the specific recovery of that property;

6. For an accounting of all funds and digital assets received from Michaels, of all trading conducted with them, of all funds, property and benefits received from Dr. B or any other investor in or on account of the Venture, and of the

Venture's business, and for payment of the amounts found due;

7. For the imposition of a constructive trust under Civil Code sections 2223 and 2224 over Michaels's 6 Bitcoin and 75 Ether, their proceeds, and all property traceable to the funds and assets he transferred to Defendants, including the accounts and wallets in which they are held, and over one-third of the property, profits and benefits Defendants derived from the Venture's business;

8. For three times the amount of Michaels's actual damages, costs of suit, and reasonable attorney's fees under Penal Code section 496, subdivision (c);

9. For punitive and exemplary damages under Civil Code section 3294 on the Fifth, Sixth, Seventh, Eleventh and Thirteenth Causes of Action;

10. For prejudgment interest under Civil Code sections 3287, 3288, 3289 and 3336 and as otherwise permitted by law;

11. For preliminary and permanent injunctive relief restraining Defendants from transferring, encumbering or dissipating Michaels's 6 Bitcoin and 75 Ether, their proceeds, and the accounts and wallets in which they are held;

12. For costs of suit; and

13. For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff David Michaels demands a trial by jury on all causes of action and issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Local Rule 38-1.

DATED: October 16, 2026 UMHOFER, MITCHELL & KING LLP

By: *s/ Matthew Donald Umhofer*
Matthew Donald Umhofer
Adam Snyder

*Attorneys for Plaintiff David Michaels*